EXHIBIT 2

```
[Federal Register: June 21, 2004 (Volume 69, Number 118)]
[Notices]
[Page 34388-34393]
From the Federal Register Online via GPO Access [wais.access.gpo.gov]
[DOCID:fr21jn04-74]
```

-----------------------------------------------------------------------

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs


Final Determination Against Federal Acknowledgement of the **Golden Hill Paugussett** Tribe

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Notice of final determination.

-----------------------------------------------------------------------

SUMMARY: Pursuant to 25 CFR 83.10(m), notice is hereby given that the Principal Deputy Assistant Secretary--Indian Affairs (PD AS-IA) declines to acknowledge a group known as the **Golden Hill Paugussett** Tribe (GHP), c/o Mr. Aurelius H. Piper, Jr., Suite 236, 1440 Whalley Avenue, New Haven, Connecticut 06515, as an Indian tribe within the meaning of Federal law. This notice is based on a final determination that the petitioning group does not satisfy all seven of the criteria set forth in part 83 of title 25 of the Code of Federal Regulations (25 CFR part 83), specifically criteria 83.7(a), (b), (c), and (e), and therefore does not meet the requirements for a government-to-government relationship with the United States.

DATES: This determination is final and will become effective 90 days from publication of this notice, pursuant to 25 CFR 83.10(l)(4), unless a request for reconsideration is filed pursuant to 25 CFR 83.11.

FOR FURTHER INFORMATION CONTACT: R. Lee Fleming, Director, Office of Federal Acknowledgment, (202) 513-7650.

[[Page 34389]]


SUPPLEMENTARY INFORMATION: Under delegated authority, the Secretary of the Department of the Interior (Secretary) ordered, through the Assistant Secretary-Indian Affairs (AS-IA), the PD AS-IA ``to execute all documents, including regulations and other Federal Register notices, and perform all other duties relating to Federal recognition of Native American tribes.'' Pursuant to this order, the PD AS-IA makes the determination regarding the petitioner's status, as defined in the acknowledgment regulations as one of the duties delegated by the Secretary to the AS-IA (209 Department Manual 8), and from the AS-IA to the PD AS-IA (Secretarial Order No. 3252).
    A notice of a proposed finding (PF) to decline to acknowledge the GHP was published in the Federal Register January 29, 2003 (68 FR 4507). That notice was based on a determination that the GHP petitioner did not satisfy all seven of the mandatory criteria set forth in 25 CFR 83.7, specifically criteria 83.7(b), (c), and (e), and, therefore, did not meet the requirements for a government-to-government relationship

with the United States.

The available evidence for the PF showed that the GHP petitioner and its antecedents met criteria 83.7(a) for identification since 1900, 83.7(d) for providing a governing document, 83.7(f) for not being members of an acknowledged Indian tribe, and 83.7(g) for not being the subject of legislation terminating or forbidding the Federal relationship.

The PF concluded that the petitioner did not meet the requirements for criterion 83.7(b), that community continuously exist from historical times to the present because there was insufficient evidence provided that community existed for the GHP since 1823. The PF also concluded that the evidence was insufficient to demonstrate that the GHP met criterion 83.7(c), that the petitioner did not demonstrate political influence within the group since 1802. Further, the PF concluded that the State of Connecticut (State) had recognized a **Golden Hill** entity from colonial times to the present, but found that the particular State recognition of the GHP group combined with limited direct evidence for community and political process was not sufficient to demonstrate that criteria 83.7(b) and (c). Finally, the PF concluded there was insufficient evidence to demonstrate the petitioner met criterion 83.7(e), descent from a historical tribe or from tribes that had combined and functioned as a single autonomous political entity.

This final determination (FD) follows a review of the petitioner and third-party comments on the PF. The GHP petitioner submitted no response to the third-party public comments. This FD reviewed the evidence considered for the PF, and evaluated that evidence in the light of the new documentation and arguments received from the petitioner and third parties.

Criterion 83.7(a) requires that the petitioner demonstrate that it has been identified as an American Indian entity on a substantially continuous basis since 1900. The PF concluded that from 1900 to the present, the petitioner and its claimed antecedent group, generally called the ``**Golden Hill** Indians'' until the mid-1970's, and the ``**Golden Hill Paugussett**'' since that time, had regularly been identified as an Indian entity. The PF, however, determined that the identifications applied only to the **Golden Hill** entity that the State recognized, which comprises a small portion (33 percent) of the petitioner's current membership. The available identifications did not pertain to the portion (63 percent) of the group, added in 1999, which claims descent from a historical Turkey **Hill** entity and that the petitioner contends was always a part of the historical **Golden Hill** entity. Four percent of the group's membership is of unknown ancestry. For criteria 83.7(b) and 83.7(c), the available record for the PF did not demonstrate that a **Golden Hill** group and a Turkey **Hill** group had ever combined and functioned as a single autonomous political entity. For the purposes of criterion 83.7(a), none of the available evidence for the PF showed that any outside observer at any time since 1900 identified a combined group of **Golden Hill** and Turkey **Hill** Indians as a single Indian entity. Also, the available evidence for the PF did not identify the existence of a separate Turkey **Hill** group as an American Indian entity on a substantially continuous basis since 1900.

The GHP petitioner and third parties submitted no new evidence of identifications for criterion 83.7(a). In its comments, the petitioner asserts that the historical Turkey **Hill** Indians and the petitioner's claimed **Golden Hill** antecedents were one entity since colonial times, and that, therefore, identifications of the State-recognized **Golden Hill** entity apply to the portion of the group, added in 1999, claiming descent from a Turkey **Hill** entity. In its comments, the State argues that there is no evidence of identifications for a combined Turkey **Hill** and **Golden Hill** entity since 1900.

As previously stated, since 1900, one of the petitioner's claimed antecedent groups, the State-recognized **Golden Hill** entity, has regularly been identified as an Indian entity. Yet, these available identifications apply only to the State-recognized **Golden Hill** entity, which comprises only a small portion (33 percent) of the petitioner's current membership. The available identifications do not pertain to the now predominant part (63 percent) of the group, the Tinney line added in 1999, which claims descent from a historical Turkey **Hill** entity. The available evidence does not show that external observers identified a separate Turkey **Hill** entity, or a Turkey **Hill** group that amalgamated with the State-recognized **Golden Hill** entity, on a substantially continuous basis since 1900. More specifically, no available evidence is found in the records that external sources identified the Tinney line as part of the State-recognized **Golden Hill** entity between 1900 and 1998.

These facts, which call into question the nature of the GHP petitioner's current makeup, require the reevaluation of the PF's conclusion for criterion 83.7(a). The GHP petitioner has not demonstrated the external identifications of a State-recognized **Golden Hill** entity applied to the petitioner's components as a whole on a substantially continuous basis since 1900. Thus, this FD reverses the conclusion of the PF, and now finds that the GHP petitioner does not meet the requirements of criterion 83.7(a).

Criterion 83.7(b) requires the GHP petitioner to demonstrate that a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present. The PF concluded that only the portion of the petitioner's membership claiming descent from the historical **Golden Hill** Indians, and not the portion claiming descent from the historical Turkey **Hill**, had met criterion 83.7(b) up to 1823, when the State-appointed overseer took the last known census of the historical **Golden Hill** group. For the time since, GHP did not provide for the PF sufficient evidence to establish that a predominant portion of the group comprised a distinct, continuous community. Between 1824 and around 1850, the historical group lost its social cohesion and ceased to exist as a distinct community. For the period roughly from 1850 to 1973, the available evidence for the PF indicated the group was little more than a small family composed of individuals who claimed descent from the historical **Golden Hill** group. For the period since 1973, when the group expanded somewhat in membership, there was insufficient

[[Page 34390]]

evidence for the PF that a predominant portion of its membership had significant social interaction. Most evidence of social community for the modern period was limited to a small group of members, at times only a few individuals, who were closely related.

Regarding the portion of the GHP petitioner that claimed descent from a Turkey **Hill** entity, the PF concluded that the families at the Turkey **Hill** reservation evolved from the historical **Paugussett** proper, while those living at the **Golden Hill** reservation were originally part of the historical Pequannock, a separate tribe. The colonial (and later State) authorities viewed and identified the historical Turkey **Hill** as a separate entity from the **Golden Hill** reservation. There was insufficient evidence for the PF of consistent interactions and significant social relationships between the historical Turkey **Hill** and **Golden Hill** groups after the establishment of their reservations in the 1600's. The PF encouraged the petitioner to submit evidence that demonstrated such interactions and relationships, or to demonstrate the amalgamation of the two groups. Similarly, the evidence for the PF did

not demonstrate that the historical **Golden Hill** exercised any political influence or authority over the historical Turkey **Hill** group, or vice versa. The evidence did not show the two groups functioning as a single autonomous political entity. The PF encouraged the petitioner to submit evidence of political amalgamation.

   In its comments, the GHP petitioner submitted a report that claims the tribes of the lower Housatonic River were part of a ``Greater Wappinger Confederacy'' during the colonial period. The petitioner contends that the membership of these tribes in this confederacy demonstrated that the historical **Golden Hill** Indians and the historical Turkey **Hill** Indians were one entity. The FD finds that the available evidence does not demonstrate that this ``Greater Wappinger Confederacy'' containing the lower Housatonic River tribes existed or that the historical **Golden Hill** Indians of Fairfield County and the historical Turkey **Hill** Indians of New Haven County existed together as one tribe during the colonial period. Nor does the evidence indicate the **Golden Hill** and Turkey **Hill** were part of a ``**Paugussett**'' confederacy or single nation or tribe. Further, the evidence presented for the existence of this ``Greater Wappinger Confederacy'' does not demonstrate the existence of significant social interaction between the historical **Golden Hill** and the historical Turkey **Hill** during the colonial period following the creation of their separate reservations in the 17th century. This FD affirms the conclusions of the PF that there was insufficient evidence that the historical **Golden Hill** and Turkey **Hill** were a community or separate communities that amalgamated.

   An analysis of the evidence for both the PF and the FD, particularly various State documents dating from 1791 to 1910, indicates that the historical, State-recognized Turkey **Hill** Indians ceased to exist socially and politically around 1825-1826, after the sale of their reservation in Orange (New Haven County), Connecticut. The available evidence indicates that Connecticut did not maintain a continuous relationship or a State-recognized reservation with a Turkey **Hill** group after that time. Afterwards, the State dealt only sporadically with individuals identified in State documents as Turkey **Hill** descendants. There is no available evidence to show that after 1825 the historical Turkey **Hill** had any significant social interaction with itself, or a **Golden Hill** group, or that the State ever recognized a combined Turkey **Hill** and **Golden Hill** entity. Thus, the activities of individuals identified as Turkey **Hill** Indians in State documents from 1791 to 1910 do not demonstrate community during those years.

   The GHP petitioner submitted a report that asserts to demonstrate the existence of a ``tribal society'' of ``**Paugussett** Indians'' called ``Little Liberia'' in the south end of Bridgeport, Connecticut, during the 19th century, to show the continued existence of a distinct community among its claimed antecedents during the 19th century. The available evidence does not support this claim. The available evidence does not demonstrate the ``Little Liberia'' neighborhood of 19th century Bridgeport was a **Golden Hill**, Turkey **Hill**, ``**Paugussett**,'' or Indian community, or that it contained such an entity within its boundaries. The evidence shows it was a community of African Americans, composed mainly of former slaves and migrants from rural Connecticut or the southern states, a few of whom might have had Indian ancestry. The available evidence shows that this community was established in the 1820's largely by and for African Americans and not Native Americans.

   The Federal acknowledgement regulations require that the evidence for criterion 83.7(b) demonstrate that a predominant portion of the petitioning group comprises a distinct community and has existed as a community since historical times. Under 83.1, the regulations define community as ``any group of people which can demonstrate that consistent interactions and significant social relationships exist

within its membership and that its members are differentiated from and identified as distinct from nonmembers.'' The evidence submitted is insufficient to demonstrate that ``Little Liberia'' was a community antecedent to the GHP petitioner. Therefore, evidence of social relationships interaction in Bridgeport's ``Little Liberia'' in the 19th century and later does not demonstrate community for the GHP petitioner.

The GHP petitioner submitted information on a man named Joel Freeman, a prominent member of the ``Little Liberia'' community. The petitioner maintains that this man links the Bridgeport community and the Turkey Hill Indians of Derby. However, the petitioner has submitted no evidence to demonstrate that the ``Joel Freeman'' of the ``Little Liberia'' community was the same ``Joel Freeman'' listed as an heir-at-law of the Indian John Howd (an Indian associated with the Naugatuck reservation in Derby, Connecticut). No other documentation has been presented to link ``Joel Freeman'' to any other Turkey Hill, Naugatuck or Paugussett Indians.

The GHP petitioner also has not been able to demonstrate that the claimed Tinney family descends from either the Turkey Hill Indians or the descendants of John Howd, or that the Tinney descendants were a separate Indian entity that amalgamated with the Golden Hill or were part of the GHP prior to 1999. Further, the GHP petitioner has not demonstrated that this family interacted with or maintained contact with the Golden Hill descendants throughout the 20th century. With the exception of one Tinney descendant mentioned in the organization's documents during the early 1970's (who identified himself at the time as a ``Pequot'' rather than as a ``Golden Hill Paugussett''), there is no evidence that any other members of the Tinney family associated with the GHP group until 1999. Finally, the documentation submitted by the State in its comments regarding the Turkey Hill descendants provides evidence contrary to the arguments advanced by the GHP petitioner regarding the descent of the Tinney family. The GHP petitioner did not submit any response to the State's documentation, although some of the archival material contradicts the claims made in the GHP petitioner's submission.

The GHP petitioner has not addressed specific concerns raised in the PF regarding community during the 19th

[[Page 34391]]

and 20th centuries with sufficient evidence. The petitioner submitted a number of Oral History Questionnaires to OFA without context, explanation, or analysis. The petitioner also did not include any new probative interviews in this submission.

The GHP petitioner submitted documentation for criterion 83.7(b) that does not demonstrate community among the portion of the group claiming descent from the historic Golden Hill Indians after 1823, or the portion claiming descent from the historic Turkey Hill Indians at any time after 1825. The GHP petitioner did not provide evidence that shows community among a combined Golden Hill/Turkey Hill entity at any time. The evidence submitted regarding the ``Little Liberia'' community is not supported with acceptable evidence and does not demonstrate community for ``Paugussett'' or other Indians antecedent to the petitioner. The evidence submitted for the 20th century does not show community among either group of descendants until the 1970's, and then only for the Sherman descendants (the portion of the petitioner claiming descent from the Golden Hill Indians). With the exception of one person (Fred Tinney), the two portions of the petitioner did not demonstrate any interaction until 1999, when the Tinney descendants enrolled with the GHP. Even for the period after their enrollment in

1999, the petitioner has provided insufficient evidence of significant levels of interaction with to demonstrate community. This FD affirms the conclusion of the PF that the petitioner does not meet criterion 83.7(b) since 1823. Thus, the GHP petitioner does not meet criterion 83.7(b) from historical times to the present.

Criterion 83.7(c) requires the petitioner to demonstrate that it has maintained political influence or authority over its members as an autonomous entity from historical times until the present. The PF concluded that only the portion of the GHP petitioner claiming descent from the historical **Golden Hill**, and not the portion claiming decent from the Turkey **Hill**, met criterion 83.7(c) up to 1802, when the overseer sold the last sections of the State reservation with the historical **Golden Hill** group's approval. The GHP petitioner did not provide sufficient evidence to meet the criterion since 1802. Further, from 1824 to around 1850, the available evidence for the PF indicated the historical **Golden Hill**'s known survivors lost political influence. From the early 1850's to around 1973, the available evidence for the PF did not indicate there was an Indian entity or individuals who functioned as leaders within a group political process. Since 1973, the available evidence for the PF indicated the leadership was limited to a small number of family-appointed leaders, or part of a small family group, but that evidence was not sufficient to demonstrate bilateral relationships with the rest of the membership.

The GHP petitioner's comments objecting to the PF's findings that the **Golden Hill** and Turkey **Hill** were separate political and social entities are discussed under criterion 83.7(b). In summary, since the historical Turkey **Hill** and historical **Golden Hill** were separate entities, evidence of political influence within one entity does not provide evidence for the other.

The petitioner has submitted very little documentation in its comments in support of criterion 83.7(c). Some of the new assertions regarding leadership, such as those concerning Joel Freeman and the ``Little Liberia'' community, are based on incomplete or invalid documentation. Other contentions, such as the ``chieftainships'' of two men named Rensselaer Pease and George Freeman, are not supported by documentation. However, documentation submitted by the State has provided evidence that negates claims made by the petitioner that the Turkey **Hill** Indians and/or the John Howd descendents were subject to any leadership from the **Golden Hill** descendants; in fact, two of the three named and documented Turkey **Hill** descendants stated in 1910 that the Turkey **Hill** tribe had long since ceased to exist as a political entity and made no mention of the **Golden Hill** descendants.

The GHP petitioner presented additional evidence for the 20th century that is not sufficient to answer the questions posed by the PF. The GHP petitioner has reiterated that a woman named Ethel Sherman acted as a ``tribal'' leader, but has not submitted any evidence in its comments demonstrating that she advocated for any members of the group other than her own children or grandchildren. The GHP petitioner has not submitted evidence to demonstrate that the GHP group supported or was aware of a 1933 ``ceremony'' where Ethel Sherman is reported to have assumed the title of ``chieftess.'' The 1934 notice of a ``meeting'' held by Ethel Sherman is insufficient to demonstrate any political authority because it gives no additional information about what may have occurred or who may have attended.

The GHP petitioner submitted other documentation regarding leadership under Aurelius Piper Sr. after 1973 and Aurelius Piper Jr. after 1993. This evidence is insufficient also to indicate a bilateral relationship between the group's members. Little indication of input from the group's membership on issues of importance to the group is found in this evidence. The GHP petitioner submitted documentation that

is substantively the same as it had included in previous submissions, and contained little new information regarding this time period.

The GHP petitioner also has not provided any new information regarding the Tinney descendants. There is little to no information for any Tinney descendants other than one member's brief period of involvement with the group during the 1970's, which was described in the PF. Further, the available evidence does not demonstrate involvement of the Tinney family in the political processes of the group since their enrollment in 1999. Finally, the petitioner has not been able to explain with the available evidence the absence of the Tinney descendants in the group prior to the late 1990's. For the above reasons, this FD affirms the conclusion of the PF that the petitioner does not meet criterion 83.7(c) since 1802.

The PF concluded that the Colony and later State recognized a **Golden Hill** entity from colonial times to the present. Yet, the PF also concluded that the particular relationship of the State to the GHP group, in combination with the limited direct evidence for community and political process that was still so limited, was not sufficient evidence to demonstrate that criteria 83.7(b) and (c) were met. The Department has issued two decisions that have significant bearing on the role of continuous State recognition and its use as evidence with regard to political influence to satisfy the requirements of criterion 83.7(c). In the Historical Eastern Pequot (HEP) FD, issued in June 2002, the Department determined that the existence of a continuous relationship between the State and the HEP provided evidence, when considered with other available evidence for a historical time period, to satisfy the requirements of criteria 83.7(b) and (c).

In the Schaghticoke (STN) FD, issued January 28, 2004, the Department further defined the evidentiary value of continuous State recognition. In STN, the petitioner presented substantial evidence of political influence and social community. However, the STN petitioner did not have direct documentary evidence regarding political influence for two significant time periods (1820-1840 and 1892-1936). The STN petitioner did have a continuous relationship with the State,

[[Page 34392]]

and met criterion 83.7(b). In the STN FD, the Department determined that an active, continuous relationship between a State and a petitioning group could itself constitute evidence sufficient to satisfy the requirements of criterion 83.7(c) under these circumstances.

Whether a State's continuous recognition of a tribe and the resulting political relationship constitute evidence sufficient to satisfy the requirements of section 83.7(c) depends on the specific facts presented by the petitioner. In the case of GHP, the petitioner has enjoyed a continuous relationship with the State from colonial times to the present. The historical **Golden Hill** tribe first occupied one reservation set aside by the State in 1639, which was sold in 1802. GHP later occupied another reservation set aside by the State in 1933, which was quit-claimed to the State by William Sherman in 1886. Overseers have been appointed by the State to manage **Golden Hill** accounts.

The existence of a continuous State relationship can constitute evidence because it is at its core a recognition that a group exists as a political entity. But the nature of the State's recognition is as important as the historical, factual basis of a petition submitted by a group. Here, the continuous State relationship with the GHP is not as vigorous as the relationships documented in the FD's for the HEP and STN. Here also, the documentary evidence is not sufficient for a

significantly longer period of time than in either the HEP or STN case. In fact, there is little evidence of political influence since 1802, or social community since 1823 to the present. Without more evidence of social and or political influence, a finding that the continuous State relationship itself is sufficient to satisfy criterion 83.7(c) from 1802 to the present, a period of 202 years cannot be supported.

This is not to say that a continuous State relationship cannot be evidence in itself for criterion 83.7(c). As in STN, where significant documentary records acted as evidentiary bookends, the State's relationship can be sufficient evidence of the petitioning group's political existence when criterion 83.7(b) is met. Thus, the State's continuous recognition of a group can mean that the group is a political entity. However, at some point, a political entity must exist and function on its own, through its membership. Where an entity exercises political influence some autonomous political activity over its members must exist. In the case of GHP, there is scant evidence of autonomous political influence over its members after 1802. Without more substantial evidence of political activity since then, the continuous State relationship cannot substitute.

Criterion 83.7(d) requires the petitioner to provide a copy of the group's present governing document including its membership criteria. In the absence of a written document, the petitioner must provide a statement describing in full its membership criteria and current governing procedures. The GHP meets the requirements of criterion 83.7(d) because it submitted a copy of its 2003 constitution that included a description of its membership criteria.

Criterion 83.7(e) requires the petitioner to demonstrate that its membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes that combined and functioned as a single autonomous political entity, and that the petitioner submit a complete list of its membership. The GHP petitioner submitted a membership list dated January 2004 containing the names, birth dates, residential addresses, and maiden names of 108 individuals (one name was duplicated, making 109 on the original list). The list was separately certified by four of the five GHP council members on January 23, 2004. This list comprises the GHP's base membership roll and its present membership for Federal purposes.

Twenty-seven individuals (25 percent of the membership) descend from William Sherman (1825-1886) and his wife Nancy Hopkins (1832-1903): including 4 members (4 percent) who descend from their daughter Caroline (Sherman) Bosley (1865-1927), and 23 members (21 percent) who descend from their granddaughter Ethel (Sherman) Piper Baldwin (1893-1993), daughter of George William Sherman (1862-1938). The petitioner claims that William Sherman was a descendant of the historical **Golden Hill** Indians. The GHP has not submitted sufficient evidence to demonstrate by a reasonable likelihood of the validity of the facts that William Sherman, his wife, or any of his descendants descend from a member or members of the historical **Golden Hill** tribe or from historical tribes that combined and functioned as a single autonomous political entity. The petitioner has not submitted sufficient documentation to connect William Sherman to the historical **Golden Hill** Indians listed on the State overseer's 1823 census or any other State documents in the available evidence that identified the **Golden Hill** group.

Nine individuals (8 percent of the membership) descend from John Henry Burnie (a.k.a. Ernest H. Sherman) (1907-1945) and his wife Florence Irene Loper (1908-1985). The GHP petitioner claims that John Henry Burnie (a.k.a. Ernest H. Sherman) was a great-grandson of William Sherman and his wife Nancy Hopkins, through their son George William Sherman (1862-1938) and his wife Harriet Curtis (?-1904), and through

George's son Edward L. Sherman (1888-1974) and his wife Eva Hungerford (dates unknown). However, the available evidence indicates that John Henry Burnie (a.k.a. Ernest H. Sherman) was the son of Eva Hungerford and another man, possibly James Hubbard, and was not the son of Edward L. Sherman. The petitioner has not submitted sufficient evidence to demonstrate by a reasonable likelihood of the facts that John Henry Burnie (a.k.a. Ernest H. Sherman), his wife, or any of his descendants descend from William Sherman, from George William Sherman, from Edward L. Sherman, or from a member or members of the historical **Golden Hill** tribe or from historical tribes which combined and functioned as a single autonomous political entity.

Sixty-eight individuals (63 percent of the membership) descend from Mary Louise Allen (1870-1965) and her husband Charles William Tinney (1866-1926). The petitioner asserted that Mary Louise Allen was a descendant of the historical Turkey **Hill** Indians. However, the GHP has not submitted sufficient evidence to demonstrate by a reasonable likelihood of the validity of the facts that Mary Louise Allen descends from the historical Turkey **Hill** Indians. In its comments, the State submitted court documents from 1909-1910 indicating that neither of Mary Louise Allen's parents, Levi Allen (1795-1865) and Delia (Myrick/Merrick) Phillips (1797-1890), was a descendant of the historical Turkey **Hill** tribe. In addition, the available evidence does not demonstrate that the historical **Golden Hill** Indians and the historical Turkey **Hill** Indians ever combined and functioned as a single autonomous political entity.

Finally, four individuals (4 percent of the membership) are of unknown ancestry. The petitioner did not submit evidence to connect these individuals genealogically with any of the above-named groups of descendants.

The GHP did not provide evidence acceptable to the Secretary to demonstrate the reasonable likelihood of the validity of the facts that any of the 108 individuals on the January 2004 GHP membership list descend from the historical **Golden Hill** Tribe or from historical Indian tribes that combined and functioned as a single autonomous

[[Page 34393]]

political entity. Therefore, the conclusion in the PF, that the GHP do not meet criterion 83.7(e), is affirmed.

Criterion 83.7(f) requires the petitioner demonstrate that the membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe. The available evidence does not demonstrate that any members of the GHP are enrolled with any federally acknowledged North American Indian tribe. Neither the petitioner nor the interested parties provided further comments or evidence pertaining to this criterion. Therefore, the conclusion in the PF that the GHP meets criterion 83.7(f) is confirmed.

Criterion 83.7(g) requires the petitioner demonstrate that it is not the subject of congressional legislation expressly terminating or forbidding the Federal relationship. There has been no Federal termination legislation regarding the GHP. Neither the GHP nor the interested parties provided further comments or evidence pertaining to this criterion. Therefore, the conclusion in the PF that the GHP meets criterion 83.7(g) is affirmed.

Under Section 83.10(m), the PD AS-IA is required to decline to acknowledge that a petitioner is an Indian tribe if the petitioner fails to satisfy any one of the seven mandatory criteria for Federal acknowledgment. The GHP petitioner did not submit evidence sufficient to meet criteria 83.7(a), (b), (c), and (e), and, therefore, does not

satisfy the requirements to be acknowledged as an Indian tribe in order to establish a government-to-government relationship with the United States.

This determination is final and will become effective 90 days from publication of this notice, unless a request for reconsideration is filed pursuant to section 83.11. The petitioner or any interested party may file a request for reconsideration of this determination with the Interior Board of Indian Appeals (section 83.11(a)(1)). These requests must be received no later than 90 days after publication of the PD AS-IA's determination in the Federal Register (section 83.11(a)(2)).

Dated: June 14, 2004.
Aurene M. Martin,
Principal Deputy Assistant Secretary--Indian Affairs.
[FR Doc. 04-13871 Filed 6-18-04; 8:45 am]
BILLING CODE 4310-4J-P