## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GOLDEN HILL PAUGUSSETT TRIBE** | : | |
| **OF INDIANS,** | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **Civil No. 2:92CV0738(JBA)** |
| | : | **CONSOLIDATED** |
| | : | |
| **M. JODI RELL, GOVERNOR** | : | |
| **OF THE STATE OF CONNECTICUT,ET AL.,** | : | |
| *Defendants.* | : | **JULY 28, 2006** |

## ANSWER AND DEFENSES OF THE DEFENDANT
## M. JODI RELL, GOVERNOR OF THE STATE OF CONNECTICUT,
## TO THE AMENDED COMPLAINT DATED JULY 19, 2006

The defendant M. Jodi Rell, Governor of the State of Connecticut, submits the following as her Answer and Defenses to the plaintiff's Amended Complaint dated July 19, 2006:

1. The defendant is without knowledge or information sufficient to form a belief as to truth of the first part of Paragraph 1 of the Amended Complaint that alleges that this is an action to restore possession of certain aboriginal and reservation lands in Bridgeport. The defendant denies the rest of that paragraph (beginning, "which land are subject," etc.), which asserts that the land were subject to the Nonintercourse Act, 25 U.S.C. § 177 and that the lands were taken in violation of common law.

2. As to Paragraph 2 of the Amended Complaint, the defendant admits only that the plaintiff invokes jurisdiction pursuant to the statutes cited, and denies that jurisdiction is properly invoked or that it exists. The defendant further denies that there is jurisdiction over

the Governor and the State of Connecticut, based on the Eleventh Amendment of the United States Constitution.  The defendant is without knowledge or information sufficient to form a belief as to the knowledge or to the truth of the second sentence of Paragraph 2 of the Amended Complaint.

3.  The defendant denies Paragraph 3 of the Amended Complaint.

4.  As to the first sentence of Paragraph 4 of the Amended Complain, ("The plaintiff Golden Hill," etc.), the defendant denies that the plaintiff group is an Indian tribe under Federal law and is without knowledge or information sufficient to form a belief as to its truth as to the rest of that sentence (beginning, "which has resided in," etc.).  As to that portion of the second sentence of Paragraph 4 that alleges, "The Tribe is recognized by the State of Connecticut," the defendant admits only that what the Amended Complaint alleges as the "Golden Hill Paugussett Tribe of Indians" is at this time referred to in State statutes as a State Indian group, but denies that the State recognizes the plaintiff group as having tribal status under federal law.  See Conn. Gen. Stat. § 47-66h(b).  The defendant admits as to the rest of the second sentence in Paragraph 4 only that the plaintiff group has property held for its benefit in Trumbull and Colchester.

5.  The defendant admits the first sentence of Paragraph 5 of the Amended Complaint and the first part of the second sentence of Paragraph 5, which alleges that the Governor is named because the State possesses, asserts an interest in and claims title to certain land in Bridgeport, Connecticut.  As to the rest of that sentence, which begins "which are a portion of the reservation and aboriginal land," etc., the defendant is without knowledge or information sufficient to form a belief as to its truth.

2

6.  The defendant admits the first sentence and first part of the second sentence of Paragraph 6 of the Amended Complaint ending with "Bridgeport, Connecticut."  The defendant is without knowledge or information sufficient to form a belief as to the truth of the rest of that sentence and paragraph, beginning "which are a portion," etc.

7.  As to Paragraph 7 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

8.  As to Paragraph 8 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

9.  As to Paragraph 9, the provisions quoted speak for themselves.

10.  As to the first part of Paragraph 10 of the Amended Complaint, the provisions quoted speak for themselves.  The defendant denies that the quotation of the statute, 25 U.S.C. § 177, is complete and denies that those portions of the quoted statue are completely exact.  The defendant denies the second full sentence in Paragraph 10 (beginning, "This section has been continuously in force in substantially the same terms," etc.), for the reason that fails to disclose material provisions of the original statute at the time of the transactions complained of.  As to the last sentence (beginning, "This provision is commonly know," etc.), the defendant admits only that the Act at the time of the transactions complained of was know as "An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers."  As to anything else in that sentence, the defendant is without knowledge or information sufficient to form a belief as to its truth.

11.  The first sentence of Paragraph 11 of the Amended Complaint ("Prior to the American Revolution," etc.) is denied for the reason that from the founding of Connecticut and the formation of the social compact by the adoption of the Fundamental Orders, the ap-

plication of the people for the Charter of Charles II and their voluntary acceptance of it, through the present, the authority of Connecticut's government originated from the assent of the people, and was not dependent on royal prerogative.  The second sentence of Paragraph 11 ("On October 7, 1763," etc.) is admitted.  The third sentence of Paragraph 11 which purports to quote the Proclamation is denied as an inaccurate statement which also fails to disclose material facts so as to mislead as to some of the portions quoted, even assuming that the Proclamation has any legal force as the plaintiff asserts, which is specifically denied.  One of the omissions at the end of the quotation states "comformable to such directions and instructions as we *or they* [i.e. the proprietaries] shall think proper to give for that purpose." (Emphasis added.)

12.  As to Paragraph 12 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

13.  As to Paragraph 13 of the Amended Complaint, the defendant denies that it is a complete statement of law.

14.  As to Paragraph 14 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

15.  As to Paragraph 15 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

16.  As to Paragraph 16 of the Amended Complaint, the defendant admits only that according to Public Records of the Colony of Connecticut (hereafter "Colonial Records"), in 1659-60, a dispute was settled between Stratford and Fairfield by creating a reservation for the Indians at Paquanack, subject, however, terms and conditions which the plaintiff fail to disclose.  As to anything in Paragraph 16 which is inconsistent with the Colonial Records,

the defendant is without knowledge or information sufficient to form a belief as to the truth of those inconsistencies.

17.  As to Paragraph 17 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

18.  As to Paragraph 18 of the Amended Complaint, the defendant admits only that according to the Colonial Records, in October 1762, Tom Sherman, his wife, Eunice Shoran, and Sarah Shoran, referred to as Indians belonging to Pequanock in Stratford, represented to the General Assembly that they together with many other Indians long since dead or dispersed into other places were lawfully seized of lands, consisting of about 80 acres at Golden Hill.  The defendant admits they petitioned the Assembly to investigate their ejectment from those lands.  As to anything in Paragraph 18 of the Amended Complaint which is inconsistent with the Colonial Records, the defendant is without knowledge or information sufficient to form a belief as to the truth of those inconsistencies.  The defendant denies that Tom Sherman and Eunice and Sarah Shoran petitioned "on behalf of the Tribe" as alleged in Paragraph 18.

19.  As to Paragraph 19 of the Amended Complaint, the defendant admits only that according to the Colonial Records the dispute was settled based on reasons and terms and conditions with the plaintiff fails to disclose.  As to anything in Paragraph 19 of the Amended Complaint which is inconsistent with the Colonial Records, the defendant is without knowledge or information sufficient to form a belief as to the truth of those inconsistencies.  The defendant denies those portions of Paragraph 19 which allege "Tribal land."  As to that part of Paragraph 19 which alleges the 12 acre portion came "from the reservation," the defendant is without knowledge or information sufficient to form a belief as to their truth.

The defendant denies that the action of the Assembly was in violation of the "Proclamation" and the common law.

20. The defendant is without knowledge or information sufficient to form a belief as to the truth of the first sentence of Paragraph 20 of the Amended Complaint ("The sixty-eight acre portion," etc.). The defendant admits the second sentence of that Paragraph ("These lands are subjects," etc.).

21. As to Paragraph 21, the defendant admits only that the Constitution became effective in 1789 and that it gave Congress the power to regulate commerce with Indian tribes, Article I, § 8. Anything else is denied.

22. The defendant admits the first sentence of Paragraph 22 of the Amended Complaint. As to the second sentence of Paragraph 22, the defendant denies that the 1790 Act was modified only "slightly" afterwards. As to the remaining allegations in the second sentence of Paragraph 232 the statutes speak for themselves and any inconsistencies with them are denied. The defendant denies the third and fourth sentences of Paragraph 22 (beginning with "The Nonintercourse Act confirmed," etc., through and including the end of Paragraph 22).

23. As to Paragraph 23 of the Amended Complaint, the defendant admits only that according to the State Records, Thomas Sherman, Eunice Sherman, and others called Golden Hill Indians, totaling about 5 persons, petitioned the General Assembly to sell their lands for reasons and objectives which the plaintiff fail to disclose. As to anything in Paragraph 23 inconsistent with the petition and action taken on it by the General Assembly at that time, the defendant is without knowledge or information sufficient to form a belief as to the truth of

those inconsistencies.  The defendant denies the words "purported" and "supposedly" in Paragraph 23.

24.  As to Paragraph 24 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

25.  As to Paragraphs 25 of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

26.  The defendant denies the first part of Paragraph 26 of the Amended Complaint, to the effect that the U.S. Government has never consented to or approved the 1802 Act of the General Assembly or any conveyance or alienation pursuant to it and the additional part which alleges that the title and right of possession has not been transferred to any the defendant or any other party with the consent or approval of the federal government, for the reason that the United States government consented to the exercise of jurisdiction and guardianship by the state of Connecticut over Indians and Indian groups within the State, including land transactions pursuant to State law.  The defendant is without knowledge or information sufficient to form a belief at this time as to whether the enactment, acts, and any conveyance or alienation referred to in the first part of Paragraph 26 of the Amended Complaint, previously described, were specifically approved by the Federal government, but denies the rest of Paragraph 26, which alleges that the acts, enactments and conveyances are void and the last sentence.

27 – 41.  As to Paragraphs 27 through 41 inclusive of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

42.  As to Paragraph 42 of the Amended Complaint, the defendant admits that the State of Connecticut possesses lands, claims title to and has an interest in a portion of Routes

8/25 in Bridgeport. The defendant is without knowledge or information sufficient to form a belief as to the truth of the alleged description. The defendant denies the first sentence of Paragraph 42 (concerning Trumbull Garden Apartments), insofar as it alleges possession, claims of title or legal interest by the defendant in that property. The defendant denies that the property is held in violation of the Nonintercourse Act.

43. As to Paragraph 43 of the Amended Complaint, the defendant admits that the State of Connecticut possesses lands, claims title to and has an interest in a portion of Routes 8/25 in Bridgeport. The defendant is without knowledge or information sufficient to form a belief as to the truth of the alleged description. The defendant denies that the property is held in violation of the "Proclamation and the common law."

44-159. As to Paragraphs 44 through 159 inclusive of the Amended Complaint, the defendant is without knowledge or information sufficient to form a belief as to their truth.

160-162. The defendant denies Paragraphs 160, 161, and 162 inclusive of the Amended Complaint.

## FIRST DEFENSE

### FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

1. The Amended Complaint fails to state a claim against the defendant upon which relief can be granted.

2. The Amended Complaint fails to allege that as of the dates of the original land transactions complained of and prior thereto the United States of America had by treaty pursuant to the United States Constitution recognized that the plaintiff group had a right to govern itself separately from the State of Connecticut, that the group had jurisdiction over the

group's alleged territory completely exclusive of the State of Connecticut and anyone else, that the Federal government had the sole and exclusive right to regulate all intercourse with the group and to manage its affairs, and that the group had possessory rights guaranteed by the Federal government. The Amended Complaint also fails to allege that the United States had recognized the plaintiff group by treaty or otherwise as an Indian tribe under Federal law.

3. The Amended Complaint fails to allege that, as of the dates of the land transactions complained of and prior thereto, the United States had determined the plaintiff group should be recognized and dealt with as a dependent Indian tribe requiring the guardianship and protection of the United States, and that it was the purpose of Congress to subject the group and its alleged lands to federal legislation enacted in the exercise of the Federal government's guardianship over recognized Indian tribes and their properties.

4. The Amended Complaint further fails to allege that there was such a prior treaty as previously described which would have given the public and the State of Connecticut fair notice at the time that all land transactions in the Amended Complaint would be invalid unless made by treaty or convention entered into pursuant to the U.S. Constitution, and that the security and stability of land titles would be jeopardized unless such a treaty or convention was obtained.

5. The Amended Complaint further fails to allege that there was such prior and specific Congressional recognition as previously described which would have given the public and the State of Connecticut fair notice at the time that all land transactions in the Amended Complaint would be invalid unless made by treaty or convention entered into pursuant to the U.S. Constitution, and that the stability and security of land titles would be jeopardized unless such a treaty or convention was obtained. Nothing herein concedes that there was

such a subsequent treaty as previously described so as to invalidate retroactively land transactions entered into in good faith at the time. Nothing herein concedes that there was such subsequent and specific Congressional recognition as previously described so as to invalidate retroactively land transactions entered into in good faith at the time.

6.    The Amended Complaint fails to state a claim upon which relief can be granted because it is obvious that the land has long been in the possession of numerous innocent purchasers and continues to be in the possession of innocent purchasers.

7.    The Amended Complaint fails to allege that if the land transactions complained of were in fact unlawful and invalid as alleged, why the plaintiff did not sue earlier; why it was so long ignorant of its alleged rights; how and when it first learned of the matters alleged; why it could not have discovered these matters earlier with ordinary diligence; and why the plaintiff group waited for almost two centuries and more before first bringing suit after the properties had passed into the hands of numerous innocent purchasers, had dramatically increased in value and after there had been substantial change in circumstances.

8.    The Amended Complaint fails to demonstrate that the land involved are subject to the Acts and other matters relied on and that those acts and other matter applied to non-treaty groups such as the plaintiff in geographical areas such as Connecticut, in view of the principle that no law should be construed so as to divest persons and the State of their rights to property, unless the purpose to do so be shown with such certainty as to put it beyond reasonable question, in view also of the fact that this is an action to dispossess citizens and other persons and parties of their rights to the land, and in view of other principles of law and justice.

9.     Those portions of the Amended Complaint based on the Proclamation of King George III in 1763, before the establishment of the United States of America, fail to show the jurisdiction of this Court in that they do not arise under the Constitution, treaties and laws of the United States, but instead under the ancient edict of a foreign prince.  The claims based on the Proclamation of 1763 were dismissed in 1993.  *GHP v. Weicker*, 839 F. Supp. 130, 135-39 (D. Conn. 1993) (Dorsey, *J.*).  The GHP did not appeal the dismissal of these claims. *GHP v. Weicker*, 39 F.3d 51, 55 (2d Cir. 1994).

10.     Those portions of the Amended Complaint described in paragraph 9, *supra*, also fail to state a claim upon which relief can be granted because, among many other reasons, the territory of an American government is held pursuant to its own laws and not pursuant to a foreign edict.  The claims based on the Proclamation of 1763 were dismissed in 1993.  *GHP v. Weicker*, 839 F. Supp. 130, 135-39 (D. Conn. 1993) (Dorsey, *J.*).  The GHP did not appeal the dismissal of these claims.  *GHP v. Weicker*, 39 F.3d 51, 55 (2d Cir. 1994).

11.     The Amended Complaint fails to state a claim for relief for attorneys' fees, no statutory authority having been shown.

## SECOND DEFENSE

## LACK OF SUBJECT MATTER JURISDICTION

1.  There is a lack of jurisdiction over the subject matter because the plaintiff lacks tribal status under Federal law.  The Amended Complaint further fails to allege that the plaintiff group has been duly recognized by the Secretary of the Interior as required by Title 28 U.S.C. § 1362.

2.  There is a lack of subject matter jurisdiction over the defendant M. Jodi Rell, Governor of the State of Connecticut, inasmuch as both the Governor and the State are immune

from suit and liability under the Eleventh Amendment of the Constitution of the United States.

### THIRD DEFENSE

### RETROACTIVE INVALIDATION OF FEDERAL POLICY REFLECTED IN FEDERAL LAWS IS UNJUST

1.  It has been the policy of the United States government that persons and groups such as the plaintiff have not been under Federal jurisdiction and control and have never been regarded as wards of the United States.   They have been residents of that part of the country which constituted the territory of the thirteen original States as recognized by Great Britain in 1783.  No treaties or agreements were ever made with them by the General Government, nor has it ever exercised any supervision or control over them.

2.  Their political condition according to the Federal government has therefore been radically different from that of the "plains" Indians, the large body of persons in the western section of the country who became subjects or wards of the government with the accession of territory ceded by France in 1803 (the Louisiana Purchase); by annexation of Texas in 1845; with the territory ceded by Mexico in 1848 (Treaty of Guadaloupe Hidalgo), the accession know as the Gadsden Purchase in 1853.  All of these "plains" Indians were at some time or other the subject of legislation by the United States Congress and to that extent recognized by the Government.

3.  The persons and groups such as the plaintiff, however, were presumed to be citizens of the United States and subject to the laws of several States where they resided.  This federal policy reflected Congressional legislation as construed by the highest levels of the legislative, executive and judicial branches of the United States government, and available

legislative history, including constructions and legislative history either not considered or specifically addressed before by the Court of Appeals for the Second Circuit. See *Mohegan Tribe v. State of Connecticut*, 638 F.2d 612, 621, 623 (2d Cir. 1981); *see also* Opinion of Rehnquist, J., dissenting from denial of petition for certiorari in *State of Connecticut v. Mohegan Tribe*, 452 U.S. 968 (1981). This evidence should also be evaluated in light of subsequent decisions of the United States Supreme Court that great weight should be given to such executive constructions, let alone legislative and judicial ones. This evidence should also be evaluated in light of the principle that a law should not be construed as intended to divest the State and other persons of rights of property and to dispossess them after the fact unless the purpose to do so is shown with such certainty as to put it beyond reasonable question.

4. It is also respectfully submitted that under the United States Constitution and principles of justice and equity, the policy of the United States as set forth above in light of the executive, legislative and judicial constructions of the laws and available legislative history should not be retroactively repudiated and reversed so as to invalidate land transactions entered into in good faith, divest the State of Connecticut and the people of the State of Connecticut, and all other persons and parties of rights previously acquired, accepted and recognized, destroy justifiable expectations, and brand as unfair and unlawful conduct stamped as fair and lawful at the time these persons and parties including the State of Connecticut acted.

## FOURTH DEFENSE

### THE DEFENDANT ACTED IN ACCORDANCE WITH LEGISLATIVE INTENT

1. The defendant does not waive the plaintiff' obligation to prove in an action to dispossess innocent landowners that the laws relied on applied to the land involved. Consistent

with the plaintiff's burden in this respect, the defendant provides notice that the Federal laws relied on in this case made the State laws applicable to the land referred to in the Amended Complaint.

2.   The boundary in the alienation of lands prohibitions ("within the bounds of the United States") of the Act to Regulate Trade and Intercourse with the Indian tribes and Preserve Peace on the Frontiers of March 30, 1802, 2 Stat. 139, 143, § 12, read not in isolation but in light of the assumptions of those who drafted the act, the common notions of the day, and available legislative history, referred to lands beyond the Indian boundaries and in all the territory belonging to the Union, but not within the limits of any particular State, at least in the absence of a different boundary line established by treaties between the United States and various Indian tribes, incorporated in later versions of the Act and which did not apply in this case.  *See, e.g.*, 1 Stat. 469, § 1 (1796); 1 Stat. 743, § 1 (1799); and 2 Stat. 139, § 1 (1802). Congress construed the Federal and State powers to extinguish title to lands reserved to the Indians accordingly.

3.   In addition, the President of the United States pursuant to his Constitutional duty to take care that the laws be faithfully executed (Art. § 3, United States Constitution), and the discretion vested in him by the Act regulating Indian trade and intercourse and preserving peace on the frontiers, construed § 19 of that act, 2 Stat. 139, 145 (1802) which provided "That nothing in this act shall be construed to prevent any trade or intercourse with Indians living on land surrounded by settlements of citizens of the United States and being within the ordinary jurisdiction of any of the individual states"  to exempt the Indian groups in all the New England States, leaving those groups to the undisturbed control of the States.  The Presidents' construction conformed to the clear interpretation of that act and the uniform

14

practice of the Federal Government.  These reservations in favor of the States also included land transactions, as the Chief Executive construed and applied the Act.  The President's interpretation was public, furthermore, and Congress was aware of it and shared it.

4.  The Congress of the United States, moreover, pursuant to its Constitutional authority to regulate commerce with the Indian tribes (Art. I § 8, cls. 3 United States Constitution), through its reports and other proceedings, had recognized that persons and groups such as the plaintiff were not to be governed by treaties but instead were enclosed and surrounded by non-Indian population, had been brought within the ordinary jurisdiction of the States and were to be controlled by regular State laws.  Congress viewed these persons and groups as within the exceptions in the various Indian Intercourse Acts such as § 19 of the 1802 law, exempting Indian groups "surrounded by settlements to the citizens of the United States and being within the ordinary jurisdiction of any of the individual states," referred to previously. These exceptions also applied to land transactions.  Congress also intended that the act regulating Indian trade and intercourse and preserving peace on the frontier demonstrate a due regard for the rights of non-Indian citizens.

5.  The United States Supreme Court through the judicial power vested in it to say what the law is (United States Constitution, Art. III, § 1), had distinguished Indians recognized by the United States as having tribal existence as distinct political communities from persons and groups such as the plaintiff who were small remnants surrounded by non-Indian populations and who, by their reduced numbers, had lost the power of self-government.  As to the latter persons and groups such as the plaintiff, the Supreme Court acknowledged that the laws of the State had been extended over them for the protection of their persons and property, and that they were under State jurisdiction and guardianship.  The Supreme Court

also by clear and necessary implication acknowledged that persons and groups such as the plaintiff were within the exception in § 19 of the 1802 Act regulating Indian trade and intercourse and preserving peace on the frontier ("That nothing in this act shall be construed to prevent any trade or intercourse with Indians living on land surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states.).

6. Other Federal and State Supreme courts had also ruled that the State had authority to approve land transactions such as those involved in this case, that the laws relied on in the Amended Complaint did not apply to areas such as Connecticut, or that groups such as the plaintiff were under State jurisdiction.

7. The Federal government including Congress had actual knowledge that in view of the exception previously referred to the New England States including Connecticut, as well as other original States, had exercised legislative authority and guardianship over Indians in their States including regulation of land transactions and conveyances. United States Senate proceedings recognized that no difficulty had occurred and no question had been raised about this.

8. These legislative histories, executive, legislative and judicial constructions and other matters have either been not considered or not specifically addressed by the Court of Appeals for the Second Circuit. The defendant reserves the right to offer additional materials of this nature based on further research. This evidence should also be evaluated in light of subsequent decision s of the United States Supreme Court that great weight should be given to executive constructions, let alone legislative and judicial ones. This evidence should also be evaluated in light of the principle that a law should not be construed as intended to divest

16

the State and other persons of rights of prosperity they  acquired and to dispossess them after the fact unless the purpose to do so is shown with such certainty as to put it beyond reasonable question, and in light also of other decisions of the United States Supreme Court concerning the act regulating Indian trade and intercourse and preserving peace on the frontiers.

9.  It is also respectfully submitted that under the United States Constitution and principles of justice and equity the available legislative histories and the executive, legislative and judicial constructions of the laws as set forth above evidencing the intent of Congress should not be retroactively repudiated and reversed so as to invalidate land transactions entered into in good faith at the time, divest the State of Connecticut and the people of the State of Connecticut, and all other persons and parties of rights previously acquired, accepted and recognized, destroy justified and justifiable expectations, and brand as unfair and unlawful conduct stamped as fair and lawful at the time these persons and parties including the State of Connecticut acted.

### **FIFTH DEFENSE**

**PRESUMPTION OF PROPER PERFORMANCE OF OFFICIAL DUTY
IN ACCORDANCE WITH FEDERAL LEGISLATIVE INTENT**

In view of 1) the Federal policies, available legislative histories, executive, legislative and judicial constructions indicating that the laws relied on in the compliant did not apply in this case, and the fact that the Federal government knew States such as Connecticut had exercised jurisdiction and guardianship over Indian matters in their States including land transactions, found no difficulty with this and did not question it, as stated previously (Third and Fourth Defenses); 2) the relative lack of contemporaneous and detailed proceedings kept by the early Congresses involving matters in the past and incapable of easily procured evidence;

and 3) the fact that the security of vested rights in the land including rights based on present, long and actual possession of that land is at stake in this case, it is presumed that public officials, both Federal and State, acted in accordance with the intent of Congress as manifested by the legislative, executive and judicial evidence previously set forth.

## SIXTH DEFENSE

### BONA FIDE PURCHASER FOR VALUE

The State of Connecticut is a bona fide purchaser for value by virtue of the fact that it acted at all time in complete good faith in accordance with the intent of Congress, the manner in which the President of the United States interpreted and administered the laws, the way in which the United States Congress construed them and consistently with the decisions of the United States Supreme Court and other Federal and State Supreme Courts previously set forth. (Third and Fourth Defenses.) The State of Connecticut also succeeded to the good faith rights of prior bona fide purchasers for value whose rights to market their properties could not have been retroactively impaired. The Federal court as a court of equity and justice protects the rights of innocent parties.

## SEVENTH DEFENSE

### FEDERAL GOVERNMENT DID NOT RECOGNIZE THE PLAINTIFF GROUP AS A TRIBE AND, IN FACT, HAS DENIED THE FEDERAL TRIBAL STATUS OF THAT GROUP

The Federal government has not only failed to recognize the plaintiff group as a tribe, it has affirmatively denied such recognition. It is respectfully submitted that the question of whether a group shall be recognized and dealt with as a dependent Indian tribe requiring the guardianship and protection of the United States is not to be determined by the courts. Instead, it is respectfully submitted that the Court should follow the action of the political de-

partments of the government, whose special duty is to determine such affairs, unless the tribal label is arbitrarily applied.  It is therefore respectfully submitted that the prior determinations of the Federal government as to lack of Federal tribal status previously described for groups such as the plaintiff group should not under the United States Constitution and principles of justice and equity be retroactively reversed or otherwise repudiated so as to invalidate land transactions entered into in good faith at the time, divest the State of Connecticut, the people of the State of Connecticut and other persons and parties of rights previously acquired, accepted and recognized, destroy justifies and justifiable expectations, and brand as unfair and unlawful conduct stamped as fair and lawful at the time these persons and parties including the State of Connecticut acted.

## EIGHTH DEFENSE

### LACK OF CONGRESSIONAL POWER UNDER THE CONSTITUION TO REGULATE PERSONS AND GROUPS SUCH AS THE PLAINTIFF

The Indians of Connecticut were viewed by the Federal government as small remnants surrounded by non-Indian populations and who by their reduced numbers had lost the power of self government.  The Federal government viewed them as within the ordinary jurisdiction of the State.  The power of Congress to regulate commerce with Indian tribes is based on their quasi-sovereign status.  Under the circumstances, therefore, there was no Constitutional power to regulate persons and groups such as the plaintiff over whom as the Federal government recognized the State laws had properly been extended for the protection of their persons' and property.

## NINTH DEFENSE

### FEDERAL PRINCIPLES OF LACHES AND INEQUITABLE DELAY

1.  The plaintiff is guilty of gross laches and extreme, inexcusable and unconscionable delay in bringing suit in view of the equitable control by Federal courts over actions to dispossess others, the equitable judicial powers vested in the United States courts by Art. III, § 2, cls. 1 of the Constitution, and the merger of law and equity under modern Federal procedure intended to secure the just, speedy and inexpensive determination of every action.  The defendant does not waive the legal insufficiency of the Amended Complaint in this respect, but instead provides notice of this defense.

2.  It is manifestly unjust, harsh and oppressive that almost two centuries or more later that the defendants be penalized by what for all practical purposes are asserted as secret liens.  The suit contravenes the long established salutary policy of the Federal courts that after great lapse of time there should be confidence and stability in real estate titles and security for those who purchase, possess, labor and live on the land on the strength of those titles, to avoid much injustice and hardship.  The suit having been long since barred by gross laches cannot be constitutionally revived by arguments based on subsequent statutes or other matters.

3.  The delay in this case of from well over a century to over two centuries is unconscionable for the following reasons:

a.       There has been a material change of circumstances, with property that was evidently underdeveloped at the time now having all the permanent and costly improvements and structures of a modern, major city, including principal public transportation arteries owned by the public through the State of Connecticut.  The increase in value of the property

has been so great and dramatic as to shock the sense of fairness in view of the plaintiff' efforts to dispossess others.  The setting aside of titles on which owners have relied for generations and based on which they have paid valuable consideration and invested their energy, industry, and labor would be disastrous and obviously inequitable.  The same is true for the homes that have been built and the people who live there.

b.     The Amended Complaint fails to show why the plaintiff have suddenly awakened to their alleged claims and why they were so long ignorant of them.

c.     The defendant is also prejudiced because of the difficulty in recapturing the legislative intent of the laws relied on, in view of the relative lack of detailed contemporaneous records of legislative proceedings.

d.     The defendant is also prejudiced by the difficulty of locating records at this late date showing Federal consent, and the evidence that an unknown quantity of Federal records were destroyed or are unavailable.

e.     The defendant is also prejudiced by the fact that had the plaintiff group complained at the time, Federal consent could either have been shown unnecessary in view of legislative intent, or could have sought then and there with far less difficulty, expense and public uncertainty.

f.     The defendant is also prejudiced by the difficulty of marshalling evidence concerning the issues of tribal existence and the aboriginal status of the lands involved, in view of the plaintiff' allegation that their group has resided in Connecticut since time immemorial.

g.     Had the plaintiff complained at the time, the issues could have been resolved long before the defendant acquired the land involved and constructed and maintained one of

its major highways which the plaintiff demand.  In this respect, Route 8/25, part of which the

plaintiff demands, is the major north-south expressway in western Connecticut.  It connects

three major highways, Interstates 95 (Connecticut Turnpike) and 84 and Route 15 (Merritt

Parkway).  It is a principal part of the State's transportation network, with average daily traf-

fic counts as high as 80,000 vehicles in part of Bridgeport.  It serves industries, commuters

and residents along the Naugatuck Valley area and is a significant factor in decision of busi-

nesses to relocate there.  This expressway is intended to provide for traffic safety and effi-

ciency.  It has been proposed by the State for designation as part of the National Highway

System, authorized by the Federal Surface Transportation Efficiency Act of 1991 (Pub. L.

102-240).  It is manifestly unjust and impracticable that the plaintiff waited until only now

before suing, long after that expressway had been planned, acquired, constructed and inte-

grated into the State's transportation network.

      h.     The defendant is otherwise prejudiced by the plaintiff' inexcusable delay from

the standpoint of  the defense of the case, the recovery demanded, and the general public in-

terest.

      4.  If a case demanding dispossession and rents and profits can be brought almost two

centuries or more after the fact, it can be brought ten centuries or more afterwards.  The suit

is therefore barred by Federal judicial policy requiring suits challenging land titles to be

brought within a reasonable period of time to avoid limitless litigation with its ruinous con-

sequences and greatly disproportionate hardship, to avoid dispossession of persons based on

what for all practical purposes are asserted as secret liens, and to prevent the Court from be-

ing used as an instrument of injustice and harsh and oppressive results.

**TENTH DEFENSE**

**FEDERAL PRINCIPLES OF LONG
ACQUIESCENCE AND ESTOPPEL**

Without waiving the legal insufficiency of the Amended Complaint, the defendant

provides notice as follows.  The plaintiff stood by and saw others including the defendant

acquire, build, maintain and repair the property, including the making of costly improve-

ments.  The defendant constructed and maintained a major public highway and the public has

used that highway and continues to use it and rely on it.  Throughout this time the plaintiff

failed to make known their claims until the properties were fully improved.  It remained si-

lent and inactive when good faith required that they put purchasers and owners on guard.

The plaintiff's acquiescence was such that they should not now enrich themselves at the ex-

pense of others, including the defendant and the public.  Its acquiescence amounts to affirma-

tion and ratification of the transactions complained of and abandonment of the property

claimed.  It is equitably estopped based on Federal principles of long acquiescence from

seeking to dispossess other including the defendant, demanding any and all other awards,

from maintaining this action, and seeking unjust enrichment.

**ELEVENTH DEFENSE**

**OTHER PRINCIPLES OF LIMITATION AND
PRESUMPTIONS BASED ON LONG POSSESSION**

The action is barred by each one of the following principles and laws of limitation,

each independently of the other:

1.  Under § 34 of the Judiciary Act of 1789 (1 Stat. 73, 92, An Act to establish the Ju-

dicial Courts of the United States), providing that the laws of the several states except where

the Constitution, treaties or statutes of the United States otherwise require or provide, shall be

regarded as rules of decision in trials at common law in the United States courts in cases where they apply, the acts of limitations of the several cases where they apply, the acts of limitations of the several states, where no special provision was made by Congress, form the rules of decision in the courts of the United States, and the same effect is to be given them as in State courts.  In view of the recognition by the United States Supreme Court that limitations acts rest upon sound policy and promote the peace and welfare of society, that the bringing of ancient actions at any distance of time would be utterly repugnant to the genius of our laws, that it is in the interest of the Republic that there be an end to litigation so the possessor of the soil could enjoy the fruits of his or her labor, the recognition by the U.S. Court of Appeals for the Second Circuit that Congress could not have intended and unlimited period for enforcement which would otherwise have existed, and the fact that the Federal government viewed Connecticut Indians to be subject to State laws, the action is barred by the State statutes of limitation in effect at the time of the acts complained of, by force of § 34 of the Judiciary Act of 1789.  *See* Twenty-fifth Defense, *infra*, ¶ 4.  The action having been previously barred cannot be constitutionally revived by claims based on subsequent legislation or other matters.

2.  The action is also barred by the Federal equitable principle that in order to discountenance neglect and stale demands and to prevent injustice, where possession has continued for twenty years it is a complete bar in equity to actions including those seeking to dispossess others.  The action having long since been barred cannot be constitutionally revived for the reasons stated in Paragraph 1, *supra*.

3.  The action is also barred by the Indian Claims Limitation Act of 1982, Pub. L. 97-394, 96 Stat. 1976, note following 28 U.S.C. § 2415.

4.  The action is also barred by other relevant or analogous statutes of limitations including, but not limited to, 28 U.S.C. 2462 (forfeitures and penalties).  The defendant also reserves the right to claim any limitation under 1 U.S.C. § 110.  The action having long since been barred cannot be constitutionally revived for reasons stated in Paragraph 1, *supra*.

5.  The action is also barred by the presumption of lost grant, applied by the United States Supreme Court, which recognizes that lapse of time may cure neglect or failure to secure the proper muniments of title even though the lost grant may not in fact have been executed, a rule which even applies adversely to the sovereign.  The action having long since been barred cannot be constitutionally revived for reasons stated in Paragraph 1, *supra*.

6.  The action is also barred by the principle recognized by the United States Supreme Court that after long possession of Indian lands the law presumes that possession was founded on an Indian deed duly confirmed.  The action having long since been barred cannot be constitutionally revived for reasons stated in Paragraph 1, *supra*.

7.  The action is also barred by the principle also recognized by the United States Supreme Court that whatever may commence by grant is good by prescription, which also applies to former Indian lands.  The action having long since been barred cannot be constitutionally revived for reasons stated in Paragraph 1, *supra*.

8.  The action is also barred by the principle, also recognized by the United States Supreme Court, that a general grant will be presumed by adverse, exclusive and uninterrupted possession of land for twenty years.  The action having long since been barred cannot be constitutionally revived for reasons stated in Paragraph 1, *supra*.

**TWELFTH DEFENSE**

**PRESUMPTION OF FEDERAL ACQUIESCENCE,
CONSENT AND RATIFICATION**

In view of the fact that the Federal Government including Congress had actual knowledge that the State of Connecticut had exercised legislative authority and jurisdiction over Connecticut Indians including land transactions and alienation, and the fact that the Federal Government found no difficulty with this and raised no question about it, in view of the available legislative history, policies and constructions of the highest levels of all three branches of the Federal Government previously described, in view also of the extraordinary lapse of time which necessarily obscures the evidence and the unconscionable delay in bringing suit which prejudices the search for additional evidence, it is presumed that the Federal government consented to State authority and jurisdiction over land transactions such as those alleged in the Amended Complaint, if such consent was even needed.  The defendant in this respect does not waive the plaintiff's burden to show lack of Federal consent, but instead gives notice of its defense.

**THIRTEENTH DEFENSE**

**THE RELIEF DEMANDED WOULD OTHERWISE
CONTRAVENE PRINCIPLES OF JUSTICE AND EQUITY**

The relief demanded would otherwise contravene principles of good faith, conscience, justice and equity in view of the equitable judicial powers vested in the Courts of the United States under Art. III, § 2, cis. 1 of the United States Constitution and the merger of law and equity under modern Federal procedure intended to secure the just, speedy and inexpensive determination of every action, for each of the following reasons alone, independently of the other.

1.    State Acted Pursuant to Federal Constructions

The State of Connecticut at all time acted pursuant to and consistently with available legislative history and authorized Presidential, other Executive, Congressional and Judicial constructions of the highest levels of the Federal government of the laws involved in this case as well as decisions of other Federal and State Supreme Courts, as also set forth in the Third and Fourth defenses, *supra*.  It is therefore inequitable that the plaintiff insists that the Federal government now penalize the State, and the people of the State, any of its cities and towns and all other citizens, persons and parties by granting the relief demanded.

2.    The Relief Demanded Inequitable In View of Prior Supreme Court Decisions

It is respectfully submitted that this Court should treat prior decisions of the United States Supreme Court, read in light of other Federal and State Supreme Court decisions, as having established the law that groups such as the plaintiff were surrounded by non-Indian population, had lost the powers of self-government by their reduced numbers, were subject to the laws and jurisdiction of the State for protection of their lives and property, that these State laws governed land transactions and transfers, and that the laws the plaintiff relies on did not apply to states such as Connecticut.  It is respectfully submitted that these decisions should be treated as the law in order to avoid injustice and hardship by any retroactive reversal at this late date which would overthrow land titles on which the public has reasonable and justifiably relied.

3.    Federal Government Determined Groups Such As the Plaintiff Were Not Tribes

The Federal government, pursuant to authority granted it by Constitution and laws of the United States, viewed groups such as the plaintiff including all Connecticut Indians, as

not tribes for the purpose of the laws relied on in the Amended Complaint and viewed them as being out of the tribal relations, as set forth I the Seventh Defense, *supra*.  It is therefore inequitable that the plaintiff insist that the Federal government now penalize the State and its people, any of its cities and towns and all citizens, persons and other parties by granting the relief demanded.

4.    The Federal Government Disclaimed All Responsibility for Connecticut Indians

The Federal government disclaimed all responsibility for Connecticut Indians and left the management of their affairs to the State of Connecticut.  It is therefore respectfully submitted that it is inequitable that the plaintiff insist that the Federal government now penalize the State and its people, any of its cities and towns and all citizens, persons and other parties by granting the relief demanded.

5.    Mistake and Accident Accompanied By Special Circumstances and Inequitable Conduct

Should the available legislative history and executive, legislative and judicial constructions of the Federal government for any reason be disregarded, the awards demanded would be unjust because of mistake as to the legal relationship of the State and other matters, a mistake made not only by all the thirteen original States, but also by all three branches of the Federal Government at their highest levels, and accident by way of unforeseen events. The mistake and accident were coupled with:

a.    Special circumstances, in that the State of Connecticut and the people of the State of Connecticut acted in good faith in accordance with the authorized legal position of the Federal government; and

b.      Inequitable conduct by the plaintiff in their unconscionable delay in bringing suit and long acquiescence, as set for above.

Relief should therefore be denied as inequitable.

6.      The Relief Demanded Is Otherwise Inequitable In View of Connecticut Indian Policies and Public Expenditures for the Plaintiff

a.      The State of Connecticut's Indian policy has been recognized by reputable authorities as just and honorable.  Laws prohibited purchases from the Indians without the allowance of the General Assembly, no title to land could accrue by any purchase of Indian land without the allowance of the Assembly, and no such unapproved conveyance was evidence of title.  Persons purchasing Indian lands without allowance of the Assembly were liable to forfeit triple value of the land to the public treasury.  They were subject to monetary penalty upon conviction.  Persons wronged by such sale or settlement of Indian lands without Assembly approval could recover triple damages.  Additional laws also protected lands reserved for Indians by the General Assembly.

b.      It was also Connecticut's policy in general to require settlers to purchase possession of the land before converting it to their own use.  Upon information and belief, the land involved in this case, i.e. the 80 acre reservation, was purchased by Stratford inhabitants in 1671, together with all other land (which may include other land in this case) had already been purchased several time previously.  Nevertheless, the General Court in 1678 on Amended Complaint on behalf of the Indians left prohibited Stratford from using any of the 80 acre reservation.  As a result, when the General Assembly in 1765 required Stratford to compensate the three Indian claimants, the land had already been paid for almost 100 years before.

     c.    The plaintiff group received approximately 106 acres of land in Colchester in 1981, all paid for by Federal taxpayer funds.  The State of Connecticut holds the land in trust for this group.  The State has also by law made the property tax-exempt.  This has resulted in an annual tax loss to a political subdivision of the State, an annual liability on the part of the State of Connecticut to reimburse part of this loss by payment in lieu of taxes.  Thus whatever land the plaintiff group has either abandoned or sold has been more than replaced by additional land elsewhere.  The State of Connecticut has also provided for tax exemptions for land held for the plaintiff group in Trumbull, with attendant annual tax losses for that town subject to partial State reimbursement.  The State of Connecticut, upon information and belief, has made other expenditures of public funds for the plaintiff group over the years.

     7.    <u>Additional Factors Not Disclosed by the Plaintiff, Indicate That the Extraordinary Relief Demanded Is Not Equitably Warranted.</u>

     The General Assembly of the Colony appointed committees to investigate fully all matters alleged in the 1763 petition filed by the three persons referred to in Paragraph 23 of the Amended Complaint, to hear all parties concerned, to view the property, to ascertain the truth and right of the matter, to make and hear all probable and practical proposals for quieting the land controversies permanently and preventing all disputes, and to report to the Assembly, according to the Colonial Records.  The committee reported that it has listened to the Amended Complaint of the Indians, viewed the land, examined the papers relative to the Indian title, and also heard the parties and claimants, including various Indians from different parts of the Colony claiming to be descendants from the Golden Hill Indians but who had been absent for more than 20 years.  The committee also reported that when the General Court in 1659 had ordered that the Indians might have the Golden Hill land from that time

forward, and that if the Indians should wholly at any time relinquish and desert Golden Hill that it then should remain to Stratford, that at that time the Indians were numerous, perhaps three to four hundred. The committee further reported that the Indians had been gradually decreasing by death or removals elsewhere ever since.  They were so far reduced so that there had been only one wigwam for many years past, according to the committee.  That wigwam had been pulled down by one of the Petitionees (the Stratford settlers) who claimed the Stratford proprietors had judged they owned the land and that the Indians had relin-quished or deserted the land by removing to other places, the committee stated.  The Strat-ford Proprietors had surveyed much of the land which had passed by conveyances and de-scents from one person to another and was now fenced and improved by English with build-ings on it, the committee found.  The committee also reported that there were none except three (Indian) persons, Tom Sherman and his wife, and Sarah Shoram and their children that had continued on the land down to the present time.  The other Claimants that came from other places in the Colony, were Golden Hill Indian descendants, but had removed and lived in other places for more than 20 years past and, as previously stated, had been absent from that land for all that time, according to the committee.  The committee further reported that there would be great trouble and difficulty in ejecting the possessors of the land and that in order to prevent a multiplicity of suits and to quiet the controversy urged that some other proposals be made and considered.  The Petitioners (i.e., Tom Sherman and his wife, and Sarah Shoram) with the advice and consent of their guardian made the proposals which were ultimately approved and which the Petitioners stated they would accept in full satisfaction of all demands to be had or made by them or their heirs or successors for their claim to the re-mainder of the land formerly granted to them, the committee stated.  The committee recom-

31

mended that these proposals be adopted as the best means of preventing many very lengthy and expensive lawsuits and disputes.

The General Assembly accepted and endorsed the proposals based on the committees' full inquiry, and the consent and willingness of the Indians to accept the proposals. The Assembly ordered that the properties be purchases for the Indians by the Stratford Settlers, to be held in the same manner and subject to the same limitations as the lands were held by the General Court order of 1659.  The Assembly also ordered that the Stratford settlers would then be and remain quieted in the peaceful enjoyment of the rest of the lands from any and all claims of Indians.  Although the total amount of land ordered for the Indians was less than that in 1659, the amount of land per person had greatly increased.

Concerning the 1802 transaction alleged in Paragraph 23 of the Amended Complaint, when the five persons called Golden Hill Indians petitioned the General Assembly that year, they showed that their land of about 11 and 8 acres were of little profit and could not support the expenses of agency and management.  They stated that if the lands were sold they would command a high price.  They requested that the lands be sold and that the proceeds be loaned and the interest applied for their support and benefit.  The General Assembly in authorizing the sale accordingly directed that the sale proceeds be loaned upon the most ample security for the benefit of the Indians.

     8.     <u>Present Taxpayers Completely Innocent; Relief Demanded Would Be Unjust Windfall</u>

It is also unjust that present taxpayers who are completely innocent in every way not be penalized by the relief demanded, which, in view of the lapse up to over two centuries or more, would amount to no more than a windfall to the plaintiff.  As to windfall, see *Dela-*

*ware Tribal Business Com. v. Weeks*, 430 U.S. 73, 91 (1976) (Blackmun, J., joined by the Chief Justice, concurring part and in the result).

9.    Equity Relieves Against Forfeitures and Penalties

The relief demanded would amount to forfeiture of public lands and public funds as well as private property of the private the defendants, by nature of retroactive penalties and forfeitures.  In view of the equities previously set forth, justice warrants relief from such forfeitures and penalties.

10.    The Plaintiffs Lack Clean Hands

There is an additional reason to believe that the plaintiff lack clean hands and have acted inequitably.  They have sued numerous innocent property owners and have threatened to sue many more in an attempt to cloud their titles in order to coerce the State of Connecticut and the people of the State of Connecticut to agree to an unfair settlement contrary to public interest, instead of allowing the Court to exercise its own judgment and to decide the case based on principles of law and justice.

11.    Presumption That Congress Does Not Intent Injustice

It cannot be presumed that Congress exercises its powers in such a way as to bring about injustices to States, their subdivisions, or persons acting pursuant to their permission, especially in view of the equities previously set forth.

**FOURTEENTH DEFENSE**

**TAKING OF PROPERTY WITHOUT JUST COMPENSATION**

The relief demanded under the circumstances of this case would violate the Fifth Amendment of the United States Constitution by denying the defendant of its property rights without just compensation, for reasons set forth in all the other defenses in this Answer.  In

addition, the defendant, one of the thirteen original states, never ceded the soil or jurisdiction of the land within the State to the Federal government.  Because there was no cession, the act regulating Indian trade and intercourse and preserving peace on the frontiers cannot deprive the defendant of its property.  *See Block v. North Dakota*, 461 U.S. 273, 291 (1983).

## FIFTEENTH DEFENSE

## VIOLATION OF DUE PROCESS LAW

The relief demanded under the circumstance of this case would deprive the defendant of property without due process of law by 1) retroactively reversing the position of the Federal government as to lack of Federal control and jurisdiction over Connecticut Indians, as set forth in the Third and Fourth Defenses, *supra*; 2) retroactively reversing the position of the Federal government as to non-applicability of the laws relied on in the Amended Complaint to persons and groups such as the plaintiff, including Connecticut Indians, as set forth in the Fourth Defense, *supra*, and State jurisdiction over them, as set forth in both the Third and Fourth Defenses, *supra*; 3) retroactively reversing the position of the Federal government as to lack of tribal status under the laws relied on in the Amended Complaint for groups such as the plaintiff', as set forth in the Seventh Defense, *supra*; 4) charging State officers and employees with notice of matters occurring from almost two centuries or more before it acquired the property alleged in the Amended Complaint; 5) demanding public lands and public funds after unconscionable delays averaging almost two centuries after the fact with the resulting prejudice set forth in other defenses, *supra*, including the Ninth Defense, notwithstanding justifiable reliance by the defendant on prior land titles; and 6) demanding public lands and public funds under circumstances that are otherwise arbitrary and unreasonable.

## FIFTEENTH DEFENSE

## VIOLATION OF FEDERAL GUARANTEES TO THE STATE

The relief demanded under the circumstances of this case violates Art. IV, § 3 of the United States Constitution, which provides that while Congress may make all needful rules and regulations for territory or other property belonging to the United States, "nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, *or of any particular State*." (Emphasis added.) *See also* Art. IV, § 4 of the Constitution as to the guarantee to every State of a Republican Form of Government.

## SIXTEENTH DEFENSE

## VIOLATION OF THE TENTH AMENDMENT

1. In view of the matters set forth in the Third, Fourth and Seventh Defenses, *supra*, it is respectfully requested that the decision in *Mohegan Tribe v. State of Connecticut*, 528 F. Supp. 1359, 1367-69 (1982), that there is no violation of the Tenth Amendment should be reconsidered, for the reason that the relief demanded does in fact seek to regulate the State as a State, address matters that are indisputable attributes of State sovereignty, and directly impair the State's ability to structure integral operations in areas of traditional functions. It is therefore respectfully submitted that the relief demanded under the circumstances of this case would violate the Tenth Amendment of the United States Constitution protecting powers reserved to the States or to the people.

2. There is an additional violation of the Tenth Amendment for the reason that Congress has not determined that the plaintiff group should be regarded as a dependent Indian community under Federal guardianship laws, there is no Federal treaty guarantying the plaintiff's possessory rights or otherwise recognizing it (*see* First Defense, ¶ 11 4-9, *supra*), and to

the contrary, the Federal government has determined that the plaintiff group is not a tribe for the purpose of the laws the plaintiff rely on, and that there is no Federal guardianship relationship.  See Third, Fourth and Seventh Defenses, *supra*.

### SEVENTEENTH DEFENSE

### ACQUIESCENCE, RELEASE AND ABANDONMENT BY ACCEPTANCE OF OTHER CONSIDERATION

The defendant does not waive the plaintiff' burden to prove possession since time immemorial showing that the lands involved were subject to the laws cited.  Consistent with this statement, however, the defendant provides notice that it will defend on the basis that the plaintiff group's acceptances of alternative considerations including lands and funds for all matters alleged in the Amended Complaint were releases of any rights they may have had as alleged and constituted acquiescence to the exchange of properties and relinquishment of their alleged rights.  *See, e.g., United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 358 (1941).  The plaintiff group, furthermore, by its desertion of the property alleged in the Amended Complaint.  *See, e.g., Williams v. City of Chicago*, 242 U.S. 434, 437 (1917).

### EIGHTEENTH DEFENSE

### ABORIGINAL TITLE OTHERWISE EXTINCT

The defendant does not waive the plaintiff' burden to prove possession since time immemorial showing that the lands involved were subject to the laws cited.  Consistent with this statement, however the defendant provides notice that it will also defend as follows. The plaintiff group at various times ceded to the appropriate government the property alleged in the Amended Complaint.  Furthermore, the alleged aboriginal title was otherwise extinguished, including extinguishment by actions occurring long before the establishment of the

State of Connecticut.  It is respectfully submitted that judicial inquiry into the manner,

method and time of extinguishment is barred.

## NINTEENTH DEFENSE

### ADDITIONAL EXTINGUISHMENT AND RELEASE AND ABANDONMENT OF ABORIGINAL TITLE COUPLED WITH RES JUDICATA

The defendant does not waive the plaintiff' burden to prove aboriginal title and to

show that the lands alleged were covered by the laws relied on.  Consistently with this state-

ment, the defendant provides notice as follows.  The 1765 decision of the General Assembly,

which also exercised judicial powers, ordered that the lands provided the plaintiff group were

to be held in the same manner and subject to the same limitations as the lands held by act of

the Assembly in 1659, which provided that if at any time the Indians wholly relinquished and

deserted those lands at Golden Hill, the lands should remain with Stratford.  Because the

General Assembly by the 1765 decision exercised judicial powers, its decision is binding on

the plaintiff by res judicata.  By the petition of the plaintiff group to the General Assembly in

1802 and their acceptance of that transaction they relinquished and deserted the lands and

abandoned possession in accordance with provisions for further extinguishment of that title

made prior to the passage of the acts regulating trade and intercourse and preserving peace on

the frontiers.

## TWENTIETH DEFENSE

### RES JUDICATA AND ESTOPPEL AND MUNIMENTS OF TITLE DOCTRINE

1.  Prior to the passage of the Federal laws relied on, the General Assembly exercis-

ing judicial powers also ordered as part of its decision in 1765 that the non-Indian inhabitants

of the remainder of the 80 acre property and their heirs and assigns were to be and remain

quieted in the possession and peaceable enjoyment of that property from all and any claims of the Indians.  The plaintiff are bound by the principles of res judicata, estoppel by judgment, collateral estoppel and muniments of title doctrine (*see* Twenty-First Defense, *infra*) by that decision.

2.  Prior to the passage of the acts regulating trade and intercourse and preserving peace on the frontiers, the plaintiff group agreed to accept as part of that decision the 20 acres of land and additional consideration in full satisfaction of all demands to be had or made by them or their heirs or successors to the remainder of the land formerly granted to the, which included land now demanded in the Amended Complaint.  The plaintiff are bound by principles of res judicata, estoppel by judgment, collateral estoppel, muniments of title doctrine, and are otherwise equitably estopped accordingly.

## TWENTY-FIRST DEFENSE

### RES JUDICATA COLLATERAL ESTOPPEL, AND MUNIMENTS OF TITLE DOCTRINE

Insofar as the plaintiff otherwise seek to reopen matters decided by the General Court in 1659, or the General Assembly in 1763-65, both of which in the acts alleged exercised judicial powers, the plaintiff are barred by res judicata, collateral estoppel, estoppel by judgment, and the muniments of title doctrine.  Under that doctrine, recognized by the Federal Court, when ownership has been litigated and title has been adjudicated in one of the parties, the losing party cannot relitigate the matter with those who rely upon title of the winning party.

### TWENTY-SECOND DEFENSE

### ARBITRATION AND AWARD, AND
### COMPROMISE AND SETTLEMENT

Insofar as the plaintiff also seeks to reopen matters decided by the General Court in 1659 or the General Assembly in 1763-1765, it is also barred by the principles of arbitration and award and compromise and settlement.

### TWENTY-THIRD DEFENSE

### ACCORD AND SATISFACTION, RELEASE, ELECTION
### OF REMEDIES, ESTOPPEL AND WAIVER

As to all matters alleged in the Amended Complaint, the plaintiff is barred by accord and satisfaction, release, election of remedies, estoppel by that election, estoppel by acceptance of benefits, equitable estoppel, estoppel in pais and waiver, and for all matters after 1790, by the Federal counterparts to those defenses.

### TWENTY-FOURTH DEFENSE

### IN LIGHTS OF FEDERAL GOVERNMENT'S POSITION THAT
### CONNECTICUT INDIANS WERE SUBJECT TO STATE LAWS
### AND JURISDICTION, STATE LAW DEFENSES ARE APPROPRIATE

The defendant respectfully requests reconsideration of the decision in this district (*Schaghticoke Tribe of Indians v. Kent School Corporation*, 423 F. Supp. 780 (D. Conn. 1976)), based on evidence that the Federal government considered persons and groups such as the plaintiff, including Connecticut Indians, to be subject to State law and jurisdiction. It is therefore respectfully submitted that the action is barred by each of the following independently of the other:

1.      The State Marketable Title Act, Conn. Gen. Stat. §§ 47-32b through 321, inclusive, which is intended to provide security and stability for real estate titles based on modern principles of justified reliance on land title records and reasonably title search.

2.      State law of laches and limitations (For State statute of Limitations, see Twenty-Fifth Defense, ¶ 4, *infra*.)

3.      State law of adverse possession.

4.      Waiver and estoppel by petition, deed, acceptance of benefits, and otherwise.

5.      Accord and satisfaction.

6.      All State counterparts to all Federal defenses previously set forth.

### **TWENTY-FIFTH DEFENSE**

### **CLAIMS BASED ON FOREIGN EDICT ARE MERITLESS**

The claims based on the Proclamation of 1763 were dismissed in 1993.  *GHP v. Weicker*, 839 F. Supp. 130, 135-39 (D. Conn. 1993) (Dorsey, *J.*).  The GHP did not appeal the dismissal of these claims.  *GHP v. Weicker*, 39 F.3d 51, 55 (2d Cir. 1994).  The defendant does not waive the plaintiff' burden to demonstrate a claim upon which relief can be granted, based on the alleged foreign edict, the Proclamation of George III issued over two centuries ago.  Consistent with this statement, the defendant provides notice that it will defend as follows.

1.      <u>Action Does Not Arise Under Federal Law</u>.

The action does not arise under the Constitution, treaties and laws of the United States.  Jurisdiction is otherwise improper and no claim for relief is shown under Federal law.

2.      <u>Action Barred by Prior Defenses; Action Also Barred by State Immunity</u>.

The defendant reasserts all applicable defenses previously set forth.  The action is also barred by the immunity of the State of Connecticut and its officers including the Governor from suit and liability under State law.

    3.      <u>Action Barred by State Marketable Title Act</u>.

In addition the fact that the Federal government even under the United States Constitution viewed Connecticut Indians and persons and groups such as the plaintiff as being subject to State law and jurisdiction, the action does not arise under Federal law as stated previously.  The action is therefore barred by the State Marketable Title Act, Conn. Gen. Stat. §§ 47-33b through 47-331, inclusive, which under State law shall be liberally construed to simplify and facilitate land title transactions by allowing persons to rely on a record chain of title as described in the law, subject only to such limitations as appear in that law.  *See* § 47-33k.

    4.      <u>Action Barred by Statute of Limitations and Laches</u>.

The action has also been long since barred by the appropriate colonial and state statute of limitations.  *See, e.g.,* 1 *Statute Laws of the State of Connecticut* (1808 Revision), Title XVII (Lands), Ch. III, §§ 2 and 3 (passed May, 1684) providing for 15 years limitations for actions for possession of land; *id*., Title CI (Limitations, Ch. I, § 4 (passed May, 1734) providing for three year limitations for trespass actions.  The action is also barred by laches.

    5.      <u>Adverse Possession</u>.

The action is also barred by adverse possession.

    6.      <u>Release, Waiver and Estoppel</u>.

The action is also barred by release, waiver and estoppel by the plaintiff group's agreement to the settlement approved by the General Assembly in 1765. This included equitable estoppel, estoppel in pais, and estoppel by election, as set forth in the Twentieth, Twenty-First and Twenty-Third Defenses, *supra*.

>    7.    <u>Release, Accord and Satisfaction, Arbitration and Award, Compromise and Settlement, Res Judicata, Collateral Estoppel, Muniments of Title Doctrine and Election of Remedies</u>.

The action is barred by accord and satisfaction, arbitration and award, compromise and settlement, res judicata, collateral estoppel, equitable estoppel, estoppel by judgment, muniments of title doctrine and election of remedies by reason of the decisions and orders of the General Assembly in 1763-1765 exercising judicial powers and the plaintiff group's agreement to and acceptance of those decisions, as set forth in the Nineteenth through Twenty-Third Defenses, *supra*.

>    8.    <u>Title Not To Be Determined By Foreign Edict But By American Law</u>.

Land acquired by an American government is held subject to its own Constitution and laws and not the royal prerogatives or foreign edicts of the government ceding it. By laws of the State of Connecticut all grants of land from the General Assembly of the colony of Connecticut are valid. *See, e.g.*, Conn. Gen. Stat. § 47-1. No foreign King can impart his royal prerogatives to preempt or otherwise impair the laws one of the United States. *See also* United States Constitution, Article IV, § 3, protecting claims of the States; United States Constitution, Article IV, § 4, guaranteeing to each State in the Union a Republican Form of Government; United States Constitution, Tenth Amendment, powers not delegated to the United States, nor prohibited, reserved to the States or to the people.

Furthermore, the United States of America, in General Congress assembled, July 4, 1776, has declared that they "are, and right ought to be, *free and independent States*:  that they are absolved from all allegiance to the British crown, and that all political connection between them and the State of Great Britain is, and ought to be, totally dissolved; and that as *free and independent* States they have full power . . . to do all other acts and things which *independent States* may of right do."  See also Declaration of Rights and privileges of the people of the State of Connecticut, passed October 1776; revised 1784; in 1 Statute Laws of the State of Connecticut 1808 Revision, Title I.

By the Treaty of Peace with Great Britain, September 3, 1783, His Britannic Majesty acknowledged the United States including the State of Connecticut to be free, sovereign and independent States; that he treated with them as such, and for himself, his heirs and successors, and relinquished all claims to the Government, proprietary and territorial rights of the same, and every part thereof.

 9.     The Awards Demanded Violate the Constitution of the
        United States and of the State of Connecticut.

The relief demanded, by relying on an ancient foreign edict to impair legislation, including validating legislation of the General Assembly and for other reasons set forth elsewhere in this Defense and previous Defenses in respect to the United States Constitution, the Constitution of the State of Connecticut, including the Preamble, Article First, Declaration of Rights, Article First, §§ 1, 2, 8, 11, 18, 20; Article Second, and Article Third, §§ 1 and 13.

 10.     Edict Cited Does Not Apply.

Wholly apart from the foregoing, the plaintiff fails to demonstrate that the applicability and/or violation of the foreign edict, the Proclamation of George III, to begin with.

11.   <u>Exercise of Judicial Powers Pursuant to Charter of the British Crown
Adopted by the People of Connecticut</u>.

Wholly apart from the foregoing, the General Assembly by its decision and orders in

1763-1765 exercised judicial and other powers vested in it by the Charter of Charles II.  The

civil government contained in that charter and adopted by the people of this state, continued

as the civil government of this State after the American Revolution under the sole authority

of the people of Connecticut independent of any king or prince whatever. Act passed Octo-

ber, 1776, 1 *Public Statute Laws of the State of Connecticut*, (1808) Title I.

12.   <u>No Implied Right of Action</u>.

Wholly apart from the foregoing, the Proclamation cited contains no implied right of

action or suggestion that it was intended to subject to any liability whatsoever owners of the

land over two centuries later.

13.   <u>Proclamation Only Temporary</u>.

The decree of George III relied on by the plaintiff was only a temporary measure.

The United States Supreme Court has also recognized that decree as only temporary.  It is

respectfully submitted that under the United States Constitution and principles of justice and

equity, this recognition should not be retrospectively reversed so as to invalidate retroactively

land title relied on and obtained in good faith.

14.   <u>Validity of Land Grants Never Questioned</u>.

The United States Supreme Court has also recognized that the power to grant lands

resided, while we were colonies, in the crown, or its grantees.  The Supreme Court has fur-

ther recognized that the validity of titles given by either the crown or its grantees has never

been questioned in the Courts of the United States, and had been exercised uniformly over

territory in the possession of the Indians.  The Amended Complaint alleges that the land transaction of 1763-1785 was by action of the General Assembly of the Colony of Connecticut, which was the agent of the British Crown as well as on of its grantees.  It is respectfully submitted that under the United States Constitution and principles of justice and equity this recognition by the United States Supreme Court as to validity of land titles by the Crown or its grantees should not be retrospectively reversed so as to invalidate retroactively land titles relied on and obtained in good faith.

15.     Colonial Grants Considered As Made By The King; Presumption of Their Authority.

The United States Supreme Court has also previously recognized that land grants by colonial authorities were universally considered as made by the King, even under the 1763 Proclamation, and in addition, were presumed to be made by legitimate authority, as is the case with all other public land grants or acts of public officers.  It is respectfully submitted that under the United States Constitution and principles of justice and equity this recognition should not be retrospectively reversed so as to invalidate retroactively land titles relied on and obtained in good faith.

16.     Authority of Connecticut's Colonial Government Originated From Assent of the People.

The authority of the colonial government of Connecticut did not depend on royal signature, authority and control.  The authority originated from the assent of the people, including the formation of the social compact by the adoption of the Fundamental Orders and the application by the people for the Charter of Charles II and the voluntary acceptance of that charter by the people.

17.     Recognition by Congressional Proceedings of Authority of the

<u>American Colonies Concerning Indian Affairs</u>.

U.S. Congressional proceedings have recognized that notwithstanding the 1763 edict of George III, the Legislatures of the American colonies had full power to legislate for the government of Indians within their respective limits, that Connecticut among other colonies had legislated on Indian affairs, and that no exception seemed ever to have been taken to the exercise of that power.  It is respectfully submitted that under the United States Constitution and principles of justice and equity, this recognition should not be retroactively reversed so as to invalidate retrospectively land titles relied on and obtained in good faith.

DEFENDANT,
M. JODI RELL, GOVERNOR OF THE
STATE OF CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL


By:     /s/ Mark F. Kohler_____
        Mark F. Kohler (#ct 02272)
        Assistant Attorney General
        Susan Quinn Cobb (#ct 03850)
        Assistant Attorney General
        Office of the Attorney General
        55 Elm Street, P.O. Box 120
        Hartford, CT 06141-0120
        (860)808-5270
        (860)808-5385(fax)
        mark.kohler@po.state.ct.us
        susan.cobb@po.state.ct.us

## **CERTIFICATION**

This certifies that a copy of the foregoing Answer and Defenses was electronically filed on this 28th day of July, 2006, with notice of this filing served by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.

| | |
|---|---|
| Bernard Wishnia | Michael D. O'Connell |
| Roseland Professional Building | O'Connell, Flaherty & Attmore |
| 204 Eagle Rock Avenue | 280 Trumbull Street |
| Roseland, NJ  07068 | Hartford, CT  06103-3598 |
| | |
| William A. Wechsler | Richard L. Albrecht |
| Bailey & Wechsler | Cohen & Wolf, P.C. |
| 583 Slocum Road | 1115 Broad St., PO Box 1821 |
| Hebron, CT  06248 | Bridgeport, CT  06604 |
| | |
| Mark S. Puzella | Henry C. Winiarski, Jr. |
| Anthony M. Feeherry | 941 Wethersfield Avenue |
| Andrea L. Studley | Hartford, CT  06114-3137 |
| Goodwin, Procter & Hoar | |
| Exchange Place, 2nd Floor | |
| Boston, MA  02109-2881 | |
| | |
| David G. Chabot | John J. Kelly, Jr. |
| Gerald L. Garlick | Cantor, Floman, Gross, Kelly, |
| Linda Clifford Hadley | Amendola & Sacramone |
| Krasow, Garlick & Hadley | 378 Boston Post Road |
| One State Street | PO Box 966 |
| Hartford, CT  06103 | Orange, CT  06477 |
| | |
| Jeffrey R. Babbin | Austin K. Wolf |
| Noel E. Hanf | Cohen & Wolf, P.C. |
| Wiggin & Dana | 1115 Broad St., PO Box 1821 |
| One Century Tower | Bridgeport, CT  06604 |
| 265 Church St., PO Box 1832 | |
| New Haven, CT  06508-1832 | |
| | |
| Thomas Gugliotti | |
| Updike, Kelly & Spellacy, P.C. | |
| One State St., PO Box 231277 | |
| Hartford, CT  06123-1277 | |

Geoffrey A. Hecht
Caplan Hecht Scanlon & Mendel
20 Trumbull St., PO Box 9505
New Haven, CT  06534

Janet L. Janczewski
The Southern Connecticut Gas Co.
885 Main Street
Bridgeport, CT  06604

Robert L. Berchem
Richard J. Buturla
Berchem, Moses & Devlin, P.C.
75 Broad Street
Milford, CT  06460

Andrew M. Eschen
U.S. Department of Justice
Ben Franklin Station, PO Box 663
Washington, DC  20044-6208

Judith A. Mauzaka
Gerald T. Weiner
Weinstein, Weiner, Ignal, Vogel, & Shapiro
350 Fairfield Ave., PO Box 9177
Bridgeport, CT  06601

Stuart A. Margolis
1332 Temple Street
New Haven, CT  06510

Howard R. Wolfe
Goldman Gruder & Woods
125 Mason Street
Greenwich, CT  06830

John Pirina, Jr.
Law Offices of Arnaldo J. Sierra
215 Washington Street
Hartford, CT  06106

John B. Hughes
U.S. Attorney's Office of the Attorney General
157 Church Street, 23rd Floor, PO Box 1824
New Haven, CT  06510

James A. Trowbridge
Quinnipiac College
Law School Clinic
275 Mount Carmel Ave.
Hamden, CT  06518-1946

Kimball Haines Hunt
Hunt, Leibert, Chester & Jacobson, P.C.
50 Weston Street
Hartford, CT  06120-4626

Mark T. Anastasi
City of Bridgeport
Office of the City Attorney
999 Broad Street, 2nd Floor
Bridgeport, CT  06604-4328

Thomas E. Behuniak
44 Greenwood Circle
Seymore, CT  06483

Michael Stanton Hillis
Dombroski, Knapsack & Hillis
129 Whitney Avenue
New Haven, CT  06510

Kenneth M. Rozich                    Paul Ruszczyk
Law Firm of Edward D. Jacobs         Highland Professional Center
PO Box 1952                          408 Highland Avenue
New Haven, CT  06509                 Cheshire, CT  06410


/s/ Mark F. Kohler_____
Mark F. Kohler (#ct 02272)
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860)808-5270
(860)808-5385(fax)
mark.kohler@po.state.ct.us