# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GOLDEN HILL PAUGUSSETT TRIBE** | : | |
| **OF INDIANS,** | : | |
| _Plaintiff,_ | : | |
| | : | |
| **v.** | : | **Civil No. 2:92CV0738(JBA)** |
| | : | **CONSOLIDATED** |
| | : | |
| **M. JODI RELL, GOVERNOR** | : | |
| **OF THE STATE OF CONNECTICUT,ET AL.,** | : | |
| _Defendants._ | : | **AUGUST 2, 2006** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS OF DEFENDANT GOVERNOR OF THE STATE OF CONNECTICUT</u>

DEFENDANT,
M. JODI RELL,
GOVERNOR OF THE STATE OF
CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL

Mark F. Kohler (#ct 02272)
Assistant Attorney General
Susan Quinn Cobb (#ct 03850)
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860)808-5270
(860)808-5385(fax)
mark.kohler@po.state.ct.us
susan.cobb@po.state.ct.us

# <u>TABLE OF CONTENTS</u>

I.      Introduction ………………………………………………………………….  1

II.     Background  …………………………….…………………………………....  2

III.    Standard of Review  …………………………………………………...  6

IV.     Based on the BIA's Findings of Lack of Distinct Community, Lack of Political
        Authority, and Lack of Tribal Descent, to Which This Court Must Defer, the
        GHP Lacks Tribal Standing to Pursue Its Land Claims  ………………………  7

        A.      Tribal Status Is Required Both for Standing and the Merits of a
                Claim Under the Nonintercourse Act  …………………………………...  8

        B.      In All Respects Material to the GHP, the Factual Inquiry for
                Determining Tribal Status under the Nonintercourse Act and
                Federal Tribal Acknowledgment Are Substantively the Same …………..  9

        C.      The BIA's Findings in the Final Determination Rejecting the
                GHP's Peitition for Federal Tribal Ackowledgment Demonstrate
                That the GHP Lacks Tribal Status for All Purposes ………………………  13

                1.      A Distinct Golden Hill Indian Community Has Not Existed
                        Since the Early Nineteenth Century  ……………………………..  14

                2.      There Has Been No Exercise of Political Authority or
                        Influence in a Golden Hill Indian Community for At Least
                        Two Centuries ……………………………………………………  15

                3.      The GHP Failed to Demonstrate That Its Members Are
                        Descended from a Historical Indian Tribe ………………………  16

        D.      This Court Should Defer to and Accept as Conclusive the BIA's
                Findings …………………………………………………………………..  16

                1.      The GHP Had a Full and Fair Opportunity to Litigate the Issue of
                        Tribal Status at the BIA ………………………………………  17

2.      Both as a Matter of the Deference That Must be Accorded the
BIA's Findings Under the Primary Jurisdiction Doctrine and
as a Matter of Collateral Estoppel, the GHP May Not Relitigate
the BIA's Findings ……………………………………………..      20

E.      Applying the *Montoya* Test to the BIA's Findings, the GHP
Unquestionably Lacks Standing to Pursue Its Land Claims …………….      26

V.      Because of the Long Passage of Time, the Legitimate Reliance of
Subsequent Landowners on the Passage of Such Time, and the Extraordinarily
Disruptive Nature of the Relief Sought, the GHP's Land Claims Are Barred
as a Matter of Law Under the Recent Decisions in *Sherrill* and *Cayuga* …………      29

A.      *City of Sherrill v. Oneida Indian Nation* …………………………………      30

B.      *Cayuga Indian Nation  v. Pataki* …………………………………………      32

C.      The Application of the *Sherrill-Cayuga* Factors Require Dismissal of
the GHP's Claims ………………………………………………………      34

VI.     Conclusion ………………………………………………………………      38

ii

I.     **INTRODUCTION**

The Golden Hill tribe that allegedly occupied the lands that are the subject of the three consolidated actions no longer exists.  The plaintiff Golden Hill Paugussett ("GHP") is not an Indian tribe within the meaning of federal law and is not the successor – legal, historical, genealogical, anthropological or otherwise – of the Golden Hill tribe.  Accordingly, the plaintiff lacks standing to pursue its land claims, and the consolidated actions must be dismissed for lack of subject matter jurisdiction.[1]

These cases were stayed under the doctrine of primary jurisdiction pending the resolution by the Bureau of Indian Affairs ("BIA") of the GHP's petition for federal tribal acknowledgment.  *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51 (2d Cir. 1994).  The BIA's administrative proceedings are completed, and the BIA resoundingly rejected the GHP's petition.  *Final Determination Against Federal Acknowledgment of the Golden Hill Paugussett Tribe* (June 14, 2004) (Ex. A).  In particular, the BIA found that the GHP has not existed as a distinct community or exercised political authority or influence for nearly two hundred years and that the GHP does not descend from a historical Indian tribe.  The BIA's factual findings are compelling, and this Court must and should defer to them in making its legal determination as to whether the GHP is an Indian tribe with standing to

---

[1]     At the time of the initiation of this lawsuit, Lowell P. Weicker, Jr. was Governor of the State of Connecticut.  The Governor is now M. Jodi Rell.  *See* Fed. R. Civ. P. 25(d).

The two member cases consolidated with the lead case captioned *Golden Hill Paugussett Tribe of Indians v. Rell,* No. 2:92cv738(JBA) ("*GHP v. Rell*"), are *Golden Hill Paugussett Tribe of Indians v. Nyzio*, No. 3:93cv26(JBA) ("*GHP v. Nyzio*"), and *Golden Hill Paugussett Tribe of Indians v. Bachyrycz*, No. 3:93cv694(JBA) ("*GHP v. Bachyrycz*").  The Court's Order of Consolidation dated Feb. 23, 2000, requires all pleadings to be filed in the lead case.  The motion for judgment on the pleadings is intended to apply to all three consolidated cases.

1

pursue its land claims.  In light of the BIA's findings, the only legal conclusion that this Court can reach is that the GHP lacks tribal status.

In addition, under the recent watershed cases of *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005), and *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 2021, 2022 (2006), the GHP's land claims and the relief sought therein are barred by the equitable defenses of laches, acquiescence and impossibility.  As those cases hold, the GHP is precluded from obtaining any declaratory or monetary relief based on its alleged possessory rights because the intervening centuries since the allegedly unlawful transactions give rise to unparalleled inequities.  The character of the land has profoundly changed.  What  was once essentially undeveloped lands are now filled with homes, businesses, and roads.  The GHP's claims represent an overwhelmingly inequitable disruption to legitimate and longstanding expectations of land ownership.  The claims must therefore be dismissed as a matter of law.

## II.     BACKGROUND

The GHP has brought three separate land claims actions, which the Court has consolidated.  In the lead case, *GHP v. Rell*, the GHP sues to recover lands located in the City of Bridgeport.  The GHP alleges that it is an Indian tribe that has resided in Connecticut since time immemorial.  *GHP v. Rell* Amended Complaint dated July 19, 2006, ¶ 4.  It further alleges that it had the exclusive use and occupancy of the lands it seeks to recover until the land was sold by the State of Connecticut ("State") without the consent of the United States in violation of the Indian Trade and Nonintercourse Act, 25 U.S.C. § 177 ("Nonintercourse

Act"). [2]   The transactions that are alleged to have violated the Nonintercourse Act occurred in the early to mid-nineteenth centuries.  *GHP v. Rell* Amended Complaint, ¶¶ 23-25.  The lands sought in the lead case are located generally in downtown Bridgeport and have been highly developed over the last two centuries.  The lands that the GHP seeks from the State include parts of what is now highway Routes 8 and 25.  *Id.,* ¶ 42.  In addition, the land claim includes the former "Hi-Ho Mall" in downtown Bridgeport, *id.,* ¶ 41, which is now the site of the State's Housatonic Community College.

Similar allegations are asserted in the two companion cases.  In *GHP v. Nyzio*, the GHP claims lands located in the Town of Trumbull alleged to have been conveyed in 1854 in violation of the Nonintercourse Act.  *GHP v. Nyzio* Complaint, ¶¶ 17-18.  The Trumbull lands include part of Route 8 and residential properties.  *Id.*, ¶¶ 19-26.  In *GHP v. Bachyrycz*, the GHP seeks to recover lands located in Orange alleged to have been conveyed in 1825 in violation of the Nonintercourse Act.  *GHP v. Bachyrycz* Complaint, ¶¶ 16-17.  The lands claimed in Orange appear to be presently residential properties.[3]  *Id.*, ¶¶ 18-78.

As remedies in all three consolidated actions, the GHP seeks (1) judgment declaring that it is the owner of the land and restoring immediate possession of the land to it; (2) an

---

[2] The Amended Complaint also seeks recovery of additional lands in Bridgeport that the GHP alleges were conveyed in violation of the Proclamation of 1763 of King George III of Great Britain.  *GHP v. Rell* Amended Complaint, ¶¶ 19-20, 30, 43, 45-158.  The claims with respect to these lands were dismissed in 1993.  *GHP v. Weicker*, 839 F. Supp. 130, 135-39 (D. Conn. 1993) (Dorsey, *J.*).  The GHP did not appeal the dismissal of these claims.  *GHP v. Weicker*, 39 F.3d 51, 55 (2d Cir. 1994).  The dismissal of those claims, therefore, is the law of the case. *See Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999), *cert. denied*, 528 U.S. 1189 (2000).  Even if that were not the case, the grounds for dismissal raised in this motion – lack of tribal standing and equitable defenses – would apply equally to the claims under the Proclamation of 1763.

[3] The Governor was not named as a defendant in *GHP v. Bachyrycz*, but was named as a third-party defendant in a third-party complaint dated June 18, 1993.

accounting of all tax funds paid by possessors of the land; (3) money damages representing fair market value of land; (4) money damages representing fair rental value and profits of the land; and (5) attorney's fees and costs.[4]  *GHP v. Rell* Amended Complaint, at 43.

The defendant Governor filed an Answer to the Amended Complaint (dated Nov. 4, 1992) on January 15, 1993, and an Answer to the Amended Complaint (dated July 19, 2006) on July 28, 2006.  Among the defenses raised are laches, inequitable delay, long acquiescence, and other principles based on long possession.  Governor's Answer dated July 28, 2006.

The defendant Governor and other defendants filed motions to dismiss the GHP's action for lack of subject matter jurisdiction.  The district court (Dorsey, *J.*) dismissed without prejudice the GHP's Nonintercourse Act claims for failure to exhaust administrative remedies in light of the GHP's petition for federal tribal acknowledgment then pending before the U.S. Department of Interior ("DOI"), Bureau of Indian Affairs ("BIA").  *GHP v. Weicker*, 839 F. Supp. 130, 134-35, 139 (D. Conn. 1993).

On appeal, the Second Circuit reversed, holding that, although exhaustion of the administrative acknowledgement process was not required to assert a Nonintercourse Act claim, the doctrine of primary jurisdiction nonetheless counseled that the land claims be stayed pending the BIA's resolution of the GHP's acknowledgment petition.  *GHP v. Weicker*, 39 F.3d 51, 58-60 (2d Cir. 1994).  The court emphasized that BIA's factual findings

---

[4] The GHP had sought to add as an additional prayer for relief trespass damages in the amount of fair rental value of the land for the entire period of its alleged dispossession.  The Court denied this part of the requested amendment.  Ruling on Plaintiffs' Motion for Leave to Amend Complaint datedJuly 13, 2006 (Doc. 323).

on tribal status "will be of considerable assistance to the district court in ultimately deciding

[the GHP's] Nonintercourse Act claims."  *Id.* at 60.

With the land claims stayed, the BIA proceeded to address the GHP's

acknowledgment petition.  During the lengthy administrative process, the GHP had numerous

opportunities, of which it took advantage, to submit evidence, expert reports, and arguments

in response to BIA advice and proposed decisions.[5]  On June 14, 2004, the BIA issued its

final determination that the GHP did not satisfy the administrative criteria to be acknowledged

as an Indian tribe under federal law.  *Final Determination Against Federal Acknowledgment*

*of the Golden Hill Paugussett Tribe* (June 14, 2004) ("*GHP FD*") (Ex. A).   Specifically, the

BIA found that the GHP failed to meet four of the seven mandatory criteria for federal

acknowledgment:  (1) identification as an American Indian entity since 1900, *id.* at 21-23; (2)

continuous existence as a distinct community, *id.* at 91-92; (3) continuous exercise of political

authority or influence, *id.* at 102-04; and (4) descent from a historical Indian tribe, *id.* at 128-

29.  The GHP's factual deficiencies were expansive and overwhelming.  Indeed, the BIA

conclusively found that the GHP had not existed as a social or political community for nearly

all of the last two centuries and that the GHP's members could not even prove that they

descended from a historical Indian tribe.[6]

The GHP's subsequent requests for review by the Interior Board of Indian Appeals

and the Secretary of the Interior have been rejected.  *See* Exs. B & C.  The BIA's final

determination is a final and effective agency action.  *See* 25 C.F.R. § 83.11(h).  The GHP

---

[5] For a detailed description of the administrative proceedings, see § IV.D.1 below.

[6] For a detailed discussion of the BIA's findings, see § IV.C below.

have not filed a court appeal of the final determination under the Administrative Procedures

Act, 5 U.S.C. § 701 *et seq.*

## III.    <u>STANDARD OF REVIEW</u>

In addressing a Rule 12(c) motion for judgment on the pleadings, a court must dismiss

the action if, accepting the allegations contained in the complaint as true and drawing all

reasonable inferences in favor of the plaintiff, the plaintiff can prove no set of facts that would

entitle it to relief, and the defendant is entitled to judgment as a matter of law. *Greco v.*

*Trauner, Cohen & Thomas, LLP*, 412 F.3d 360, 363 (2d Cir. 2005); *Sheppard v. Beerman*, 18

F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816 (1994). Rule 12(c) motions generally are

limited to the facts alleged in the complaint and must be converted into a motion for

summary judgment if the court considers materials outside the pleadings. Fed. R. Civ. P.

12(c). However, a court may, without converting the motion into one for summary judgment,

consider documents that are attached to, incorporated by reference in, or integral to the

complaint, as well as any matters that are subject to judicial notice. *Sira v. Morton*, 380 F.3d

57, 59 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

The only materials outside of the pleadings relied on for this motion are the BIA's

final determination on the GHP's federal acknowledgment petition (Ex. A) and other

administrative orders or decisions of the DOI and the BIA relating to the petition. (Exs. B, C,

E). The court may take judicial notice of these documents. *See Kavowras v. New York Times*

*Co.*, 328 F.3d 50, 57 (2d Cir. 2003); *Opoka v. INS*, 94 F.3d 392, 394 (7th Cir. 1996). In

addition, to the extent that it is necessary to the Court's resolution of the equitable defenses

raised in this motion, *see* § V below, the Court may take judicial notice of the present nature

and character of the land at issue. Fed. R. Evid. 201; *see Central Green Co. v. United States*,

531 U.S. 425, 434 (2001); *Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir.), *cert. denied*, 522

U.S. 997 (1997); *Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 237 (8th Cir.

1979).

      If, however, the court concludes that it is necessary nonetheless to convert the

defendant Governor's Rule 12(c) motion into a Rule 56 motion for summary judgment, the

defendant Governor maintains that there are no genuine issues of material fact as to the issues

raised and that she is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56;

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Westinghouse Credit Corp. v.

D'Urso*, 278 F.3d 138, 145 (2d Cir. 2002).

**IV.**    <u>**BASED ON THE BIA'S FINDINGS OF LACK OF DISTINCT COMMUNITY,
LACK OF POLITICAL AUTHORITY, AND LACK OF TRIBAL DESCENT,
TO WHICH THIS COURT MUST DEFER, THE GHP LACKS TRIBAL
STANDING TO PURSUE ITS LAND CLAIMS.**</u>

      The BIA has resoundingly rejected the GHP's petition for federal acknowledgment.

In particular, the BIA found that the GHP has not existed as a distinct community or exercised

political authority or influence for nearly two hundred years and that the GHP does not

descend from a historical Indian tribe.  The BIA's factual findings are compelling, and this

Court must defer to them in making its legal determination as to whether the GHP is an Indian

tribe with standing to pursue its land claims.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*,

501 U.S. 104, 107-08 (1991); *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305-06

(1973).  In light of the BIA's findings, the only legal conclusion that this Court can reach is

that the GHP lacks tribal status.[7]

---

[7] Although the GHP's claims pursuant to the Proclamation of 1763 have already been
dismissed for want of jurisdiction, *see* note 2 above, the same conclusion as to tribal standing
would apply to those claims as well.

A.    **Tribal Status Is Required Both for Standing and the Merits of a Claim Under the Nonintercourse Act.**

The plaintiff brings this action to recover land pursuant to the Nonintercourse Act. This Act places certain restrictions on transfers of land "from any Indian nation or tribe of Indians." 25 U.S.C. § 177. Both to have standing to pursue such a claim and to establish a violation of the Nonintercourse Act, the plaintiff must demonstrate that it was and continues to be an Indian tribe. *Delaware Nation v. Pennsylvania*, 446 F.3d 410 (3d Cir. 2006); *Seneca Nation of Indians v. New York,* 382 F. 3d 245, 258 (2nd Cir. 2004); *GHP v. Weicker*, 39 F. 3d at 56, 57; *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 579, 581 (1st Cir. 1979), *cert. denied*, 444 U.S. 866 (1979). As standing is a jurisdictional prerequisite, the lack of tribal status deprives the court of subject matter jurisdiction. *See United States v. Hays,* 515 U. S. 737, 742 (1995); *LaFleur v. Whitman,* 300 F.3d 256, 269 (2nd Cir. 2002).

The GHP is not a federally recognized Indian tribe. Indeed, the federal government has expressly denied the GHP's petition for federal acknowledgment. *GHP FD* (Ex. A). For most purposes, courts have held that the federal administrative acknowledgment process is an administrative remedy that must be exhausted by an unrecognized tribe before seeking judicial relief as an Indian tribe. *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 550-51 (10th Cir. 2001); *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993); *James v. U.S. Dept. of Health & Human Servs.,* 824 F.2d 1132, 1137 (D.C. Cir. 1987); *Native American Mohegans v. United States*, 184 F. Supp. 2d 198, 222-23 (D. Conn. 2002). However, as the Second Circuit noted, "tribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act." *GHP v. Weicker*, 39 F.3d at 57. Nonetheless, it is one thing for a court to evaluate a

plaintiff's purported tribal status in the absence of a federal administrative determination of tribal acknowledgment. *See Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir. 1975) (lack of formal recognition by federal government does not necessarily preclude tribal status under the Nonintercourse Act, but executive view on tribal status is of "great significance"). It is a wholly different matter, as demonstrated below, when the plaintiff has sought acknowledgment through the administrative process, and the federal government has explicitly rejected tribal acknowledgment.

    **B.**    **In All Respects Material to the GHP, the Factual Inquiry for Determining Tribal Status under the Nonintercourse Act and Federal Tribal Acknowledgment Are Substantively the Same.**

In land claims actions under the Nonintercourse Act, courts have applied the so-called *Montoya* test for determining tribal status in the absence of federal acknowledgment. *United States v. Candelaria*, 271 U.S. 432, 441-42 (1926); *Mashpee*, 592 F.2d at 582; *Passamaquoddy*, 528 F.2d at 377. The *Montoya* test, which was developed long before the formal administrative process for recognition was established, requires a four-part showing: a plaintiff must demonstrate that it is (a) "a body of Indians of the same or similar race," (b) "united in a community," (c) "under one leadership or government," and (d) "inhabiting a particular though sometimes ill-defined territory." *Montoya v. United States*, 180 U.S. 261, 266 (1901).

Although at first blush the *Montoya* standard appears relatively simple and broadly stated, judicial applications of the standard have provided further content to the four requirements. First, to be "united in a community," a tribe must exist distinct and apart from others. *United States v. Washington*, 641 F.2d 1368, 1373 (9th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982); *Mashpee*, 592 F.2d at 586. Although a tribe must be "Indians of the same

9

or similar race," a tribe cannot be based solely on a racial or ethnic basis. *United States v. Antelope*, 430 U.S. 641, 645 (1977). Tribal status must be based on the existence of a political community. *Rice v. Cayetano*, 528 U.S. 495, 518-20 (2000); *Morton v. Mancari*, 417 U.S. 535, 553 (1974). Thus, a tribe is more than just a private, voluntary organization of individuals of Indian descent; it is a distinct community with authority or influence over internal and social relationships among its members. *United States v. Mazurie*, 419 U.S. 544, 557 (1975).

To be "under one leadership or government," a tribe must have some degree of control or influence over its own internal affairs and the relations between its leaders and members. *Mashpee*, 592 F.2d at 582-83. Political leadership must be meaningful in that it must extend beyond just a core group of involved members to include a predominant portion of the membership of the group. *Id.* at 584. Although a formal government complete with coercive or binding authority is not required, tribal status is dependent on the exercise of a significant degree of influence on significant issues in the lives of members. *Id.* at 584-85. Moreover, sporadic, crisis-oriented leadership is insufficient. There must be a sustained continuity of tribal leadership. *Id.* 583, 585. Without such leadership or at least informal political influence, a tribe does not exist under the *Montoya* standard. *Id.* at 585.

Finally, a tribe must have ***continuously*** maintained itself as a distinct community with a political organization or structure. *Washington*, 641 F.2d at 1373. The requirement of continuity is essential to tribal status. It reflects the need for a group to maintain its distinct community and the exercise of its authority throughout history to retain its tribal sovereignty. *Id.; United Tribe of Shawnee Indians*, 255 F.3d at 548; *see also Montana v. Blackfeet Tribe of Indians*, 471 U. S. 759, 764 (1985).

The acknowledgment standards promulgated and administered by the BIA are quite similar if not identical in pertinent respects to the judicial standards.  Federal acknowledgment or recognition of an Indian tribe is the formal political act of acknowledging and confirming the continual existence through history of a tribe as a distinct political community entitled to a government-to-government relationship with the federal government.  25 C.F.R. § 83.2; COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3], at 138 (2005).  Although historically, Indian tribes have been recognized in many different ways, including by treaty, congressional enactment, executive or administrative action, or, in rare instances, court decision, *see id.*, §§ 3.02[5], 3.02[6], since 1978 federal acknowledgment has been delegated to an administrative process within DOI.  25 C.F.R. Part 83.

In 1978, the DOI adopted regulations establishing a process for federal recognition of Indian tribes.  43 Fed. Reg. 39,361 (Sept. 5, 1978).  The regulations were amended in 1994.[8] 59 Fed. Reg.  9280 (Mar. 28, 1994).  In promulgating the acknowledgment regulations in 1978, DOI stated:

> The Department must be assured of the tribal character of the petitioner before the group is acknowledged.  Although the petitioners must be American Indians, groups of descendants will not be acknowledged solely on a racial basis.  ***Maintenance of tribal relations – a political relationship – is indispensable.***

---

[8] The amendments to the regulations provided for a reduced burden of proof for petitioners with evidence of previous federal acknowledgment, 25 C.F.R. § 83.8; independent review of a final determination by the Interior Board of Indian Appeals, including the opportunity for a hearing before an administrative law judge, *id.* § 83.11; and other procedural changes.  59 Fed. Reg.  9280 (1994).  The amendments were not intended to "result in the acknowledgment of petitioners which would not have been acknowledged under the previously effective acknowledgment regulations" or "to result in the denial of petitioners which would have been acknowledged under the previous regulations.  *Id.*  The substantive criteria remained the same.  The GHP's petition was decided under the amended regulations.

43 Fed. Reg. 39361, 39362 (Sept. 5, 1978). Moreover, the acknowledgment regulations are explicitly derived from and are to be interpreted in light of case law concerning tribal status. 59 Fed. Reg. 9286, 9287 (Mar. 28, 1994). As the BIA has stated in describing the intent of the acknowledgment regulations:

> The legal and policy precedents for acknowledgment are codified in the regulations. These precedents also provide the fundamental basis for interpreting the regulations. The acknowledgment criteria are based on and consistent with the past determinations of tribal existence by Congress, the courts, and the Executive Branch. These past determinations have required that to be acknowledged as having tribal status a group must have maintained social solidarity and distinctness and exercised political influence or authority throughout history until the present.

*Final Determination That the Miami Nation of Indians of the State of Indiana., Inc. Do Not Exist as an Indian Tribe*, at 1 (June 9, 1992) (Ex. H), *aff'd*, *Miami Nation of Indians of Indiana, Inc. v. Babbitt*, 112 F.Supp. 2d 742 (N.D. Ind. 2000), *aff'd*, 255 F.3d 342 (7th Cir. 2001), *cert. denied*, 534 U.S. 1129 (2002). Indeed, in doing so, it specifically referenced the *Montoya* standard. *Id.*

The acknowledgement regulations establish seven "mandatory" criteria that a petitioning group must satisfy: (a) identification as an American Indian entity since 1900 (25 C.F.R. § 83.7(a)); (b) continuous existence as a distinct community since historical[9] times (*id.*, § 83.7(b)); (c) continuous maintenance of political influence or authority over members as an autonomous entity since historical times (*id.*, § 83.7(c)); (d) a governing document including membership criteria (*id.*, § 83.7(d)); (e) descent from a historical Indian tribe and membership list (*id.*, § 83.7(e)); (f) membership is composed principally of persons not members of an

---

[9] "Historical" is defined as dating from first sustained contact with non-Indians. 25 C.F.R. § 83.1.

acknowledged tribe (*id.*, § 83.7(f)); (g) no congressional legislation terminating or forbidding acknowledgement (*id.*, § 83.7(g)).[10]

Some of these seven are not explicit parts of the *Montoya* standard – for example, criterion (d), which requires a governing document, or criterion (g), which requires that Congress has not terminated tribal status – but would nonetheless be relevant to *Montoya*'s inquiry. However, the three core criteria – (b) continuous existence as a distinct community, (c) continuous maintenance of political influence or authority, and (e) descent form a historical Indian tribe – are substantively the same as the central components of the *Montoya* test. Significantly, it is those three criteria that the BIA determined that the GHP failed to satisfy. *GHP FD,* at 18 (Ex. A).

### C.    The BIA's Findings in the Final Determination Rejecting the GHP's Petition for Federal Tribal Ackowledgment Demonstrate That the GHP Lacks Tribal Status for All Purposes.

As the Second Circuit stated, the *Montoya* test and the regulatory criteria "both have anthropological, political, geographical and cultural bases and require, at a minimum, a ***community with a political structure***." 39 F.3d at 59 (emphasis added). Although the two may not always necessarily yield the same results, in all material respects for the GHP, the BIA's findings demonstrate that the GHP lacks tribal status for purposes of both federal acknowledgment and the Nonintercourse Act. In particular, the BIA found (1) a lack of a distinct community for the last 180 years; (2) a lack of political authority for the last 200 years; and (3) the present GHP membership does not descend from the historical Golden Hill

---

[10] The regulations provide a detailed, nonexclusive description of how each of the criteria can be satisfied. The regulations are set forth in full in Exhibit D.

tribe.[11]  *GHP FD*, at 91-92, 102-04, 128-29 (Ex. A).  Indeed, the factual determinations were not even close questions.  As described below, the evidentiary deficiencies were profound and insurmountable.  Under such circumstances, there is no basis to conclude that the GHP has tribal status for purposes of the Nonintercourse Act.

### 1.    A Distinct Golden Hill Indian Community Has Not Existed Since the Early Nineteenth Century.

In its petition materials, the GHP had described itself variously as a group made up of descendants from (a) the historical Golden Hill Indians, (b) a combination of the historical Golden Hill Indians and Turkey Hill Indians, and (c) some broader group of Paugussett Indians.  *GHP FD*, at 27-34 (Ex. A).  Despite the submission of thousands of pages of documents and a multiplicity of divergent theories offered by the GHP, the BIA concluded that the evidence was woefully insufficient to establish a continuing distinct community, however characterized.  Indeed, the BIA found that the Golden Hill Indians ceased to exist as a distinct community after 1823.  *Id.* at 24, 91-92.  There was no evidence that a combined Golden Hill-Turkey Hill or broader Paugussett community existed after that date either.  *Id.* at 39-40, 55, 66, 91-92.  Instead, the BIA found that the Golden Hill Indians lost social cohesion in the 1820s.  *Id.* at 24-25, 92.  From that point on, there was but one family, the Shermans, who claimed but could not prove that they were Golden Hill Indians.  *Id.* at 66-91.  In any event, one family cannot constitute a tribe.  *Id.* at 115-16.  The GHP's efforts at showing a broader group are all discussed in detail and rejected in the Final Determination.  *Id.* at 34-91.

---

[11] The BIA also found that the GHP failed to meet criterion (a), identification as an American Indian entity since 1900.  *GHP FD*, at 21-23.  Although this is not an express requirement of the *Montoya* standard, it is fully supportive of the lack of tribal existence under that standard.

In sum, the BIA found that the GHP are not now and have not been for almost 200 years a distinct community.

### 2. There Has Been No Exercise of Political Authority or Influence in a Golden Hill Indian Community for At Least Two Centuries.

The GHP's evidentiary shortcomings were even more striking with regard to criterion (c), political authority or influence. There is simply a complete absence of evidence of political leadership or activity, formal or informal, that could satisfy either the acknowledgement regulations or the *Montoya* standard. After 1802, there is no evidence of any form of political influence or authority. *GHP FD*, at 92-96, 102-03 (Ex. A). After 1850, the group consisted solely of the Sherman family, with no evidence of any relationships, political, social or otherwise, with a broader membership. *Id.* at 96-98. From 1973 to the present, there have been self- or family-appointed leaders, but whatever political leadership or influence that may have been exercised has only been within the single family group. *Id.* at 98-102. The complete lack of evidence of political authority and influence is fatal to the GHP's claim of tribal status. Evidence of political leadership and activity, in the sense of having meaningful influence over a broad membership, is essential to tribal status. *Mashpee*, 592 F.2d at 584-85. Without it, the GHP was properly denied federal acknowledgment, and should be denied tribal status here.

### 3.   The GHP Failed to Demonstrate That Its Members Are Descended from a Historical Indian Tribe.

What is particularly telling, and troubling, about the GHP's claim of tribal status is that it was unable, despite multiple opportunities, to prove that its members in fact descend from the historical Golden Hill Indians or any other historical tribe. The key figure in the GHP's lineage is William Sherman, who lived from 1825 to 1886 and from whom a portion of the GHP's claimed membership descends. *GHP FD*, at 114-15 (Ex. A). However, the BIA found that there was no contemporaneous identification of William Sherman as a Golden Hill Indian and that there was no primary documentation to link William Sherman with a known Golden Hill ancestor. *GHP FD*, at 116-24 (Ex. A). The BIA similarly concluded that there was a lack of evidence of descent as to purported Turkey Hill Indian ancestors. *Id.* at 124-26. As discussed below, the GHP was given a full and fair opportunity to present evidence that could establish descent. Nonetheless, the GHP's efforts fell demonstrably short, and the BIA found that the evidence did not establish that the GHP's current membership represents descendants of a historical Indian tribe. *Id.* at 127-29.

In sum, the GHP's evidence is overwhelmingly insufficient. In the face of this patently deficient evidentiary record, the GHP have used every effort to obscure the real issues, including attacking its opponents as motivated by discriminatory animus and the process as unfair and politically biased. The plain and simple truth is that the GHP is not an Indian tribe.

### D.   This Court Should Defer to and Accept as Conclusive the BIA's Findings.

In invoking the doctrine of primary jurisdiction in this case, the Second Circuit noted that "the creation in 1978 of the acknowledgment process currently set forth in 25 C.F.R. Part

83 – a comprehensive set of regulations, the BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures **weigh heavily in favor of a court's giving deference to the BIA.**"  39 F.3d at 60 (emphasis added).  Therefore, "[t]he BIA's resolution of the factual issues regarding tribal status will be of considerable assistance to the district court in ultimately deciding [the GHP's] Nonintercourse Act claims."  *Id.*  As it turns out, the BIA's findings not only are of "considerable assistance," but should make this Court's task short and simple.

> **1.     The GHP Had a Full and Fair Opportunity to Litigate the Factual Issues Underlying Tribal Status at the BIA.**

The BIA gave the GHP every reasonable opportunity to make its case.  Although the BIA's administrative process is not identical to that of a court's, it provided the GHP with a full and fair opportunity to develop, present and argue its evidence supporting its petition for federal acknowledgment as an Indian tribe.  Further proceedings for the discovery or submission of additional evidence are unnecessary and unjustified.

The BIA's administrative process begins with the filing of a letter of intent by a petitioning group to be followed by the submission of a documented petition with evidence to show that the petitioning group satisfies the seven mandatory criteria.  25 C.F.R. §§ 83.4, 83.6.  Upon receipt of a documented petition, the BIA conducts a preliminary review of the petition evidence and provides "technical assistance" to the petitioner to assist the petitioner in supplementing or revising its petition.  *Id.*, §§ 83.10(a), (b).  The BIA may then issue a "letter of obvious deficiencies" to the petitioner calling attention to such deficiencies in the petition evidence, after which the petitioner may again supplement or revise its petition or may request and receive additional technical assistance.  *Id.,* § 83.10(b).  Thereafter, the

petition will be placed on "active consideration." *Id., § 83.10(f).* The BIA issues a proposed finding, and the petitioner and interested parties may receive technical assistance and have the opportunity to submit arguments and evidence to rebut or support the proposed finding. *Id.*, §§ 83.10(g), (i), (j). The petitioner may reply to any submissions by interested parties. *Id.*, § 83.10(k). The BIA then issues a final determination on the petition. *Id., § 83.10(m).* A petitioner or interested party may request independent review and reconsideration of a final determination with the Interior Board of Indian Appeals ("IBIA"), with the availability of a hearing before an administrative law judge on disputed issues of fact. *Id.*, § 83.11. Additional review is available from the Secretary of the Interior. *Id., § 83.11(f).* After exhaustion of the administrative process, a final determination may be subject to judicial review pursuant to the Administrative Procedures Act (APA), 5 U.S.C. § 701 *et seq.*; *see Miami Nation of Indiana, Inc. v. U.S. Dept. of Interior*, 255 F.3d 342, 348-49 (7th Cir. 2001), *cert. denied,* 534 U.S. 1129 (2002).

The GHP was afforded and took advantage of every aspect of the BIA's process. It submitted its documented petition to the BIA on April 12, 1993. *See* Ex. E, at 3. The BIA conducted a technical assistance review of the petition and sent the GHP an obvious deficiency letter, dealing principally with the defect that the GHP claimed descent from one person rather than from a historical Indian tribe. *Id.* The GHP responded and a second technical assistance review was provided. The GHP provided additional documentation and requested the petition be placed on active consideration. *Id.*

The BIA decided to process the petition under 25 C. F. R §83.10 (e), which permits an expedited negative proposed finding where there is little or no evidence to demonstrate that the petitioner can satisfy criterion (e), descent from a historical Indian tribe. The BIA issued a

proposed finding declining to acknowledge petitioner as an Indian tribe on June 8, 1995, because the evidence established that it did not prove descent from a historical tribe.  *GHP FD*, at 5 (Ex. A).  The GHP submitted evidence and argument in response to the 1995 proposed finding as well as comments in reply to submissions by interested parties.  On September 16, 1996, the BIA issued a final determination affirming the proposed finding that the GHP failed to prove descent from a historical Indian tribe.  *Id.*.

The GHP filed a request for reconsideration with the IBIA on December 26, 1996.  The IBIA affirmed the BIA's final determination not to acknowledge the GHP, but referred to the Secretary of the Interior certain issues outside its jurisdiction.  *Id.*; *see* 25 U.S.C. § 83.11(f).  The Secretary of the Interior, without deciding the merits, requested the BIA to address these issues and to issue a reconsidered determination.  *GHP FD*, at 5 (Ex. A).

The BIA issued a reconsidered decision, vacating its 1996 final determination and ordering that the petition be evaluated under all seven mandatory criteria.[12]  *Id.*  The GHP made extensive additional submissions.  *Id.* at 6, 26-33, 80-90, 95.

On January 29, 2003, the BIA issued a proposed finding under all seven criteria, finding that the GHP had failed to meet the mandatory criteria.  *Summary Under the Criteria for the Proposed Finding on the Golden Hill Paugussett Tribe*, at 6-38 (Ex. E).  At the GHP's request, the BIA extended the comment period to provide the GHP's researchers additional time, and the GHP subsequently submitted its comments.  On June 14, 2004, the BIA issued a final determination declining to acknowledge the GHP because of the failure to satisfy criteria (a) identification as an American Indian entity, (b) distinct community, (c) political influence

---

[12] The decision was issued by the Deputy Assistant Secretary – Indian Affairs as the Assistant Secretary – Indian Affairs had recused himself because he had previously represented the GHP.

and authority, and (e) descent from a historic Indian tribe. *Id.* at 18, 21, 91-92, 102-03, 128-29.

The GHP subsequently filed a request for reconsideration with the IBIA, which IBIA dismissed for failure to state a ground for reconsideration within its jurisdiction. Ex. B. The IBIA referred issues not within its jurisdiction to the Secretary. After receiving comments from the GHP, the State and BIA, on May 18, 2005, the Secretary declined to refer any of the issues raised by the GHP to the BIA for reconsideration. Ex. C. The BIA's final determination became an effective final agency action as of that date. *See* 28 C.F.R. § 83.11(h). The GHP has apparently elected not to seek judicial review of the final determination under the APA. *See* 5 U.S.C. § 701 *et seq.*

In light of the expansive process the BIA conducted, the GHP received a full and fair opportunity to litigate the issue of its tribal status, and no further proceedings are required in this Court to develop or submit evidence.

    **2.**    **<u>Both as a Matter of the Deference That Must be Accorded the BIA's Findings Under the Primary Jurisdiction Doctrine and as a Matter of Collateral Estoppel, the GHP May Not Relitigate the BIA's Findings.</u>**

The BIA's findings should control this Court's resolution of the GHP's tribal status under the *Montoya* standard. In applying the doctrine of primary jurisdiction, courts have avoided hard-and-fast rules, instead evaluating its application on a case-by-case basis. *United States v. Western Pacific RR Co.*, 352 U.S. 59, 64 (1956); *Tassy v. Brunswick Hospital Center, Inc.*, 296 F.3d 65, 68 (2d Cir. 2002). In the unique context of this matter, primary jurisdiction requires that the Court defer to and accept as conclusive the BIA's factual findings underlying its decision not to acknowledge the GHP. In addition, the principles of

collateral estoppel apply fully to the BIA's findings. Under either doctrine, the GHP is precluded from relitigating the BIA's findings.

First, the GHP should not be permitted to collaterally attack the BIA's findings in this litigation. The proper vehicle to challenge the BIA's findings would be an appeal under the APA. 5 U.S.C. § 701 *et seq.*; *see Miami Nation of Indiana,* 255 F.3d at 348-49. Moreover, as the Supreme Court stated in applying the doctrine of primary jurisdiction, an agency's determination, itself subject to judicial review, "would obviate any necessity for the [district] court to relitigate the issues actually disposed of by the agency decision." *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305-06 (1973). The GHP has opted to proceed in this land claim case without availing itself of judicial review of the BIA's final determination. This action is not a substitute for judicial review under the APA, and the GHP cannot use this case to relitigate any of the factual findings the BIA made. *Id.*; *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic No. 99*, 400 U.S. 62, 72 (1970).

In fact, permitting relitigation of the facts in this action would contravene the Second Circuit's justifications for invoking the primary jurisdiction doctrine – the BIA's superior expertise and authority to make the relevant factual determinations and the need for consistency in results. *GHP v. Weicker*, 39 F.3d at 59-60; *see also Ellis v. Tribune Television Co.*, 443 F.3d 71, 81-82 (2d Cir. 2006); *Tassy*, 296 F.3d at 67-68. The twin justifications for primary jurisdiction – agency expertise and uniformity – demand that this court accept as settled the BIA findings. As the Supreme Court articulated:

> Uniformity and consistency in the regulation of [a subject matter] entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts

> by specialization, by insight gained through experience, and by more flexible
> procedure.

*Far East Conf. v. United States*, 342 U.S. 570, 574 (1952); *see also Federal Maritime Bd. v.*

*Isbrandtsen Co.*, 356 U.S. 481, 498 (1958). In other words, under the doctrine of primary

jurisdiction and the deference due the BIA thereunder, what is left for this Court is to apply

the relevant law – the *Montoya* standard – to the facts found by the BIA.

Moreover, the doctrine of collateral estoppel also precludes the GHP from relitigating

the factual issues found by the BIA. It is well-established that preclusion may apply to factual

issues decided by an administrative agency. The courts generally "favor[] application of the

common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to

those determinations of administrative bodies that have attained finality." *Astoria Fed. Sav.*

*& Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991). Precluding relitigation of issues

decided by an administrative agency is

> justified on the sound and obvious principle of judicial policy that a losing litigant
> deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an
> issue identical in substance to the one he subsequently asks to raise. To hold
> otherwise would, as a general matter, impose unjustifiably upon those who have
> already shouldered their burdens, and drain the resources of an adjudicatory system
> with disputes resisting resolution.

*Id.* at 107-08. Absent evidence of a contrary statutory intent, it is presumed that Congress

expected that the common law rules of collateral estoppel would apply to an agency's

decisions. *Id.* at 108.

The principles courts have followed in giving collateral estoppel effect to agency

determinations are not unlike that for court decisions. Collateral estoppel should apply (1) to

issues of fact properly before and necessarily resolved by the agency, (2) which the parties

have had an adequate opportunity to litigate, (3) where the agency is acting in an adjudicative

capacity.  *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966);

*Metromedia Company v. Fugazy*, 983 F.2d 350, 365-66 (2d Cir. 1992), *cert. denied*, 508 U.S.

952 (1993); *Delamater v. Schweicker*, 721 F.2d 50, 53-54 (2d Cir. 1983).  The first two

requirements are plainly met.  The factual issues – the continuing existence of a distinct

community, the continuing existence of political leadership, and tribal descent – were

properly before the BIA and were obviously necessary to its resolution of the GHP's

acknowledgment petition.  As demonstrated above, *see* § IV.D.1, the GHP had a full and fair

opportunity to litigate these issues.

The only question, then, is whether the BIA was acting in an adjudicative capacity

when it issued the final determination on the GHP petition.  "An action taken by an

administrative agency to grant or deny a benefit is not an adjudicated action unless the agency

has made its decisions using procedures substantially similar to those employed by the

courts."  *Delamater*,  721 F.2d at 53-54.  The *Restatement (Second) of Judgments*, on which

the Second Circuit has relied on this issue, *id.*, identifies the following factors for assessing

whether an administrative action is adjudicatory for purposes of preclusion:

> (a) Adequate notice to persons who are bound by the adjudication. . .;
> (b) The right on behalf of a party to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut the evidence and argument of opposing parties;
> (c) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status, or a specific series thereof;
> (d) A rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered; and
> (e) Such other procedural elements as may be necessary to constitute the proceeding a sufficient means of conclusively determining the matter in question, having regard for the magnitude and complexity of the matter in question, the urgency with which the matter must be resolved, and the opportunity of the parties to obtain the evidence and formulate legal contentions.

*Restatement (Second) of Judgments*, § 83(2).

Although the BIA administrative process does not replicate judicial proceedings in all details, it is sufficiently similar to the essential procedures courts employ to justify collateral estoppel. Each of the five *Restatement* factors is present in the BIA process. Plainly, the GHP had adequate notice, having initiated the BIA's proceedings. Similarly, as described above, the GHP had ample opportunity to present evidence and argument both in support of its petition and to rebut evidence and argument of others. 25 C.F.R. §§ 83.6, 83.10. The issues were formulated with application of the acknowledgment criteria to the petitioner's evidence, and there was a final decision issued. *Id.*, §§ 83.7, 83.10(m). In this fundamental sense, the BIA proceedings on the GHP petition was adjudicatory: a petition was filed, evidence and argument was submitted, opportunity to respond to other parties' evidence and argument was provided, and a final decision was made applying established regulatory criteria to the specific facts of the petition.

There are, of course, differences between the BIA's process and court proceedings. For example, there is no compulsory discovery available. However, there are significant benefits to a petitioner in the administrative process that are not available in court proceedings. In particular, as described above, the GHP received substantial technical advice from the BIA on how to improve its petition and supporting evidence. 25 C.F.R. §§ 83.10(b), (c), (j). In addition, the acknowledgment process affords, and the GHP had the advantage of, the opportunity to comment on and respond to proposed decisions, *id*, § 83.10(h), (i), (j), (k), and independent administrative review, *id.*, § 83.11. The latter in particular reflects the adjudicatory nature of the process. Independent review before the IBIA is conducted before administrative law judges. 43 C.F.R. § 4.1(a). Proceedings before the IBIA includes briefing

by the parties with the availability of a hearing on material disputed facts or to otherwise augment the record. 25 C.F.R. § 83.11(e). It thus closely parallels a judicial process.[13]

The BIA process is crafted for the unique nature of the factual inquiry required for tribal acknowledgment. The factual determinations are highly dependent on historical documentary evidence and on anthropological, historical and genealogical analysis and expertise. It requires an examination that may span multiple centuries. Although it is possible to submit such an inquiry to a traditional judicial process, it certainly would pose an extraordinary and unwieldy task. It is safe to say that the Federal Rules of Civil Procedure were not developed with this kind of inquiry in mind. By contrast, the BIA process was expressly designed to handle the exceptionally complex, detailed and expansive evaluation of hundreds of years of history, anthropological data and genealogical information. The BIA assigns staff with expertise in each of these fields. Given this context, the differences that exist between the BIA process and traditional court procedures are fully justified, and the differences in procedure are more than compensated for by the unique procedures available in the administrative process. Therefore, the BIA process is sufficiently adjudicatory in nature, for purposes of applying collateral estoppel, to preclude the GHP from relitigating the BIA's factual findings.

Finally, given the exceptional significance of deciding whether to establish a government-to-government relationship between the federal government and an acknowledged Indian tribe and all else that federal tribal acknowledgment entails, *see United Tribe of Shawnee Indians*, 253 F.3d at 550-51; *James,* 824 F.2d at 1137, the application of

---

[13] The GHP's request before the IBIA was dismissed for failure by the GHP to articulate a basis for review within the IBIA's jurisdiction. Ex. B.

collateral estoppel here is entirely consistent with the congressional intent to have such decisions made by the BIA through the administrative process. *See Astoria* 501 U.S. at 108-11; *Duvall v. Attorney General*, 436 F.3d 382, 387-88 (3d Cir. 2006). Indeed, it is precisely the result that the Second Circuit contemplated when it invoked the primary jurisdiction doctrine in this case. Although the ultimate legal determination of tribal status through the application of the *Montoya* standard rests with the court, that decision should be predicated on the BIA's findings. *See GHP v. Weicker*, 43 F.3d at 60.

> **E.    Applying the *Montoya* Test to the BIA's Findings, the GHP Unquestionably Lacks Standing to Pursue Its Land Claims.**

Application of the *Montoya* test here is a straightforward task with a straightforward result: The GHP is not an Indian tribe within the meaning of the Nonintercourse Act.

The BIA found that there was insufficient evidence of a distinct community (however defined by the GHP) since the 1820s. *GHP FD*, at 91-93 (Ex. A). Therefore, the GHP have not been and are not now "united in a community." Second, the BIA found that there was insufficient evidence of political authority or influence for the last two centuries. *Id.* at 102-03. Thus, the GHP has not been and are not now a community "under one leadership or government." Third, the GHP is not descended from a historical Indian tribe and in particular is not descended from the historical Golden Hill tribe. *Id.* at 128-29. Thus, the GHP is not "a body of Indians of the same or similar race." The only conclusion that this Court can reach is that the GHP is not a group that has continuously maintained itself as a distinct social and political community and does not have standing as an Indian tribe. *Montoya*, 180 U.S. at 266; *Washington*, 641 F.3d at 1373; *Mashpee*, 592 F.2d at 585-86.

The recent decision of the district court in *New York v. Shinnecock Indian Nation*, 400 F. Supp. 2d 486 (E.D.N.Y. 2005), does not alter this conclusion. In that case, the court found that the plaintiff had tribal standing under the Nonintercourse Act despite the fact that a petition for acknowledgment was pending with the BIA. *Id.* at 493. The circumstances of *Shinnecock* are easily distinguishable from this case. First, and most obviously, the GHP have been ***denied*** acknowledgment by the BIA, whereas the BIA had not yet reached a determination on the Shinnecock acknowledgment petition. Second, the *Shinnecock* court found that there was evidence of two hundred years of continuous leadership and of descent from the historical tribe. *Id.* at 489-90. As reflected in the BIA's findings, nothing of the sort exists here.

The *Shinnecock* court also relied on New York's recognition of the Shinnecock as an Indian tribe. *Id.* at 489. Although the GHP is recognized by the State, *see* Conn. Gen. Stat. § 47-59a, Connecticut's relationship with the GHP is not probative of GHP's tribal status under federal law. *See* Conn. Gen. Stat. § 47-66h(b) ("Nothing in this chapter shall be construed to confer tribal status under federal law on the indigenous tribes named in section 47-59a. . . ."). The *Shinnecock* court's reasoning as to state recognition is not only readily distinguished, but is also thoroughly misguided and inconsistent with federal law. As the BIA found in rejecting the GHP's acknowledgment petition, the State's relationship with the GHP was for most of the last two hundred years minimal and uneven. *GHP FD*, at 13-14 (Ex. A). During most of that time, the State did not recognize or interact with GHP leaders, and to the extent that there was any state interaction, it was with members of a single family, not a tribal community. *Id.* at 14-15. The State's relationship therefore can not make up for the otherwise massive evidentiary gaps and deficiencies in the GHP's evidence. *Id.* at 15-16.

Moreover, the very basis for using state recognition as evidence of community or political authority has since been rejected by the Department of the Interior. In reviewing the final determinations of the acknowledgment petitions of the Eastern Pequot and Schaghticoke groups, the IBIA has concluded that state recognition of an Indian group, on its own, is not probative evidence of tribal existence. *In re Federal Acknowledgment of the Historical Eastern Pequot Tribe*, 41 IBIA 1 (May 12, 2005) (Ex. F); *In re Federal Acknowledgment of the Schaghticoke Tribal Nation*, 41 IBIA 30 (May 12, 2005), *appeal pending*, *Schaghticoke Tribal Nation v. Norton*, No. 3:06cv81(PCD) (Ex. G). Evidence of the State's relationship with an Indian group is probative for purposes of federal tribal status ***only*** to the extent that it shows the existence of ***actual***, not merely presumed, social interactions and relationships within a distinct community and the existence of ***actual***, not merely presumed, political activity and leadership.[14] *Eastern Pequot*, 41 IBIA at 18-21 (Ex. F).

Oddly, the *Shinnecock* court justified its use of state recognition by construing the federal government's decision not to participate in the litigation, despite the court's invitation to do so, as acquiescence to the plaintiff's tribal status. *Shinnecock*, 400 F. Supp. 2d at 490-91. The appropriateness of such an inference appears doubtful, but in any event the opposite is obviously the case here. Not only has the BIA rejected the GHP's tribal status, but the

---

[14] In the *GHP FD*, the BIA distinguished the nature of the State's relationship with the GHP from its relationship with the Eastern Pequot and the Schaghticoke. *GHP FD*, at 15. In the latter two cases, the BIA had improperly used state recognition to make up for otherwise insufficient evidence of community and political authority. *Id.* That use of state recognition was subsequently rejected by the IBIA, *Eastern Pequot*, 41 IBIA at 18-21 (Ex. F); *Schaghticoke*, 41 IBIA at 34 (Ex. G); and the BIA, on reconsideration, has concluded that, without the improper weight of state recognition, neither the Eastern Pequot nor the Schaghticoke satisfied the acknowledgment criteria. *Eastern Pequot Reconsidered Final Determination*, 70 Fed. Reg. 60,099 (Oct. 14, 2005); *Schaghticoke Reconsidered Final Determination*, 70 Fed. Reg. 60,101 (Oct. 14, 2005), *appeal pending*, *Schaghticoke Tribal Nation v. Norton*, No. 3:06cv81(PCD).

United States has appeared and opposes the GHP's claims in this litigation.  Even assuming the validity of the *Shinnecock* court's reasoning with regard to (a) the decision not to await the BIA's determination of the acknowledgment petition under the doctrine of primary jurisdiction; (b) the court's factual findings as to tribal status; and (c) the court's improper use of state recognition and its treatment of the federal government's nonparticipation as acquiescence as to tribal status – all of which are likely to be matters raised in later appeals – none of these factors are present in this case.

In conclusion, after according the BIA's findings the deference they are due under the doctrine of primary jurisdiction or their preclusive effect under the rules of collateral estoppel, the GHP lacks tribal standing as a matter of law, and its action must be dismissed for lack of subject matter jurisdiction.

**V.** **BECAUSE OF THE LONG PASSAGE OF TIME, THE LEGITIMATE RELIANCE OF SUBSEQUENT LANDOWNERS ON THE PASSAGE OF SUCH TIME, AND THE EXTRAORDINARILY DISRUPTIVE NATURE OF THE RELIEF SOUGHT, THE GHP'S LAND CLAIMS ARE BARRED AS A MATTER OF LAW UNDER THE RECENT DECISIONS IN *SHERRILL* AND *CAYUGA*.**

In addition to the plaintiff's clear lack of tribal standing, the GHP's claims must be dismissed as a matter of law under the equitable doctrines of laches, long acquiescence, and impossibility.  As the Second Circuit remarked in *Cayuga Indian Nation of New York v. Pataki*, 413 F.3d 266 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 2021, 2022 (2006), "[t]he Supreme Court's recent decision in *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005), has dramatically altered the legal landscape against which we consider" Indian land claims.  413 F.3d at 273.   Under the two watershed cases of *Sherrill* and *Cayuga*, the GHP –

even if they could somehow establish tribal standing, which they cannot – are barred from pursuing their claims.[15]

In *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661 (1974) ("*Oneida I*"), the Supreme Court held that federal subject matter jurisdiction existed to hear an Indian tribe's possessory land claims.   In *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985) ("*Oneida II*"), the Court held that an Indian tribe has a federal common law right of action for violation of its possessory rights and such an action was not barred by any statute of limitations.  Neither *Oneida I*  nor *Oneida II* addressed the question whether equitable defenses such as laches are available against such claims.  Indeed, *Oneida II* expressly left open the question.  *Oneida II*, 470 U.S. at 253 n.27; *see Sherrill*, 544 U.S. at 213.  The Supreme Court's decision in *Sherrill* and the Second Circuit's decision in *Cayuga Nation* answer that question in the affirmative.

**A.**    **<u>*City of Sherrill v. Oneida Indian Nation*</u>**

In *Sherrill*, a federally recognized Indian tribe claimed that its acquisition of fee title in various parcels of lands that were part of its historic reservation restored its sovereignty over the land and precluded a town from imposing property taxes on the land.  544 U.S. at 202-03.  The lands were alleged to have been conveyed to the State of New York from 1795 to 1805 without congressional approval in violation of the Nonintercourse Act.  The Court rejected the claim, holding that equitable defenses of laches, long acquiescence and impossibility "preclude the Tribe from rekindling embers of sovereignty that long ago grew cold."  *Id.* at 214.

---

[15] Although the GHP's claims pursuant to the Proclamation of 1763 have already been dismissed for want of jurisdiction, *see* note 2 above, the same conclusion as to equitable defenses would apply to those claims as well.

The Supreme Court emphasized that the relief sought "must be evaluated in light of the long history of state sovereign control over the territory" and the fact that for most of the last two centuries the federal government "largely accepted, or was indifferent to," state control of the land. *Id.* Moreover, the Court noted pointedly that "the properties here involved have greatly increased in value since the [plaintiff] sold them 200 years ago." *Id.* at 215. The long history of state jurisdiction created "justifiable expectations," which "merit heavy weight." *Id.* at 215-16.

In concluding that the equitable doctrines of laches, long acquiescence and impossibility barred the tribe's claim, the Court relied not just on the long lapse of time between the conveyance of the lands and the initiation of legal action, but also on the "dramatic changes in the character of the properties," the legitimate reliance of others, and the disruptiveness of the relief sought. *Id.* at 216-17. Laches, "a doctrine focused on one side's inaction and the other's legitimate reliance," will apply to Indian land claims, particularly where there has been an inequitable and disproportionate change in the value and character of the land. *Id.* at 217-18 (citing *Felix v. Patrick*, 145 U.S. 316, 333-34 (1892)). Similarly, under the doctrine of long acquiescence, "[w]hen a party belatedly asserts a right to present and future sovereign control over territory, longstanding observances and settled expectations are prime considerations." *Id.* at 218 (footnote omitted). Finally, the relief of returning to Indian sovereignty lands that generations passed to a large number of private owners is impracticable especially "'where development of every type imaginable has been ongoing for more than two centuries.'" *Id.* at 219 (quoting *Oneida Indian Nation v. County of Oneida*, 199 F.R.D. 61, 92 (N.D.N.Y. 2000)).

The Court also concluded that the proper vehicle for a federally recognized tribe to regain sovereign authority over land that was conveyed so long ago was the land-into-trust process created by Congress and administered by the Secretary of the Interior. *Id.* at 220-21 (citing 25 U.S.C. § 465). That process takes in account "the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory." *Id.*

Taking these factors into account – in particular, "the distance from 1805 to the present day, the [plaintiff's] long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations" – the Court held that equitable defenses of laches, acquiescence and impossibility precluded the relief sought. *Id.* at 221.

**B.      *Cayuga Indian Nation  v. Pataki***

In *Cayuga*, the Second Circuit applied and extended *Sherrill*'s teaching on the applicability of equitable defenses to Indian land claims.[16] In *Cayuga*, a federally recognized Indian tribe alleged that its historic reservation lands were conveyed in 1795 and 1807 in violation of the Nonintercourse Act. Like the plaintiff here, the plaintiff in *Caygua* sought ejectment and money damages as relief based on its alleged possessory interests. 413 F.3d at 273-74.

The Second Circuit stated that "[w]e understand *Sherrill* to hold that equitable doctrines, such as laches, acquiescence, and impossibility, can, in appropriate circumstances, be applied to Indian land claims, even when such a claim is legally viable and within the statute of limitations." *Id.* at 273. Although the *Sherrill* Court left open the question of

---

[16] On May 15, 2006, the Supreme Court denied the petitions for certiorari of both the *Cayuga* plaintiff and the United States. 126 S.Ct. 2021, 2022 (2006).

whether laches might apply to money damages for such Indian land claims, *Sherrill*, 544 U.S. at 221, the Second Circuit concluded that "the broadness of the Supreme Court's statements indicates to us that *Sherrill*'s holding is not narrowly limited to claims identical to that [in *Sherrill*], seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' Indian land claims generally." 413 F.3d at 274.

The *Cayuga* plaintiff sought ejectment and money damages for violation of its possessory rights. Although these remedies traditionally are characterized as legal in nature, the court held that what mattered for purposes of the application of equitable defenses was the inherent disruptiveness of the ***claim***, not the remedies' technical classifications. *Id.* at 276. Thus, the Second Circuit concluded that not only is the remedy of ejectment of current landowners "indisputably disruptive," but also that the "disruptiveness is inherent in the claim itself – which asks this Court to overturn years of settled land ownership – rather than an element of any particular remedy which would flow from the possessory land claim." *Id.* at 275.

The same is true, the court concluded further, for monetary remedies, such as trespass damages in the amount of the fair rental value of the land for the entire period of the alleged dispossession, a remedy that the GHP also seek here. The Second Circuit held:

> Inasmuch as plaintiffs' trespass claim is based on a violation of their constructive possession, it follows that plaintiff's inability to secure relief on their ejectment claim alleging constructive possession forecloses plaintiff's trespass claim. In other words, because plaintiffs are barred by laches from obtaining an order conferring possession in ejectment, no basis remains for finding such constructive possession or immediate right of possession as could support the damages claimed.

*Id.* at 278. Therefore, whether traditionally sounding in law or equity or whether the relief sought is for ejectment or some form of money damages, any claim based on a possessory interest is barred by equitable defenses. *Id.*

The factors identified by the Second Circuit from *Sherrill* that require dismissal of such possessory claims include: the passage of generations "during which non-Indians have owned and developed the area"; residence elsewhere by most of the group since at least the mid-nineteenth century; "'the longstanding, distinctly non-Indian character of the area and its inhabitants;'" the long time span between the conveyances and the present day; the plaintiff's long delay in pursuing its claim; and "'developments in [the area] spanning several generations.'" *Id.* at 277 (quoting *Sherrill*, 544 U.S. at 221). Given the presence of these factors, the Second Circuit concluded that equitable defenses such as laches required dismissal of the land claims as a matter of law. *Id.* at 278, 280.[17]

**C.    The Application of the *Sherrill-Cayuga* Factors Require Dismissal of the GHP's Claims.**

The GHP's claim is factually and legally indistinguishable from that in *Cayuga*. Indeed, the GHP admits that its claims are "analogous" to those in *Cayuga*. GHP Reply to Defendant's Objection to Motion for Leave to Amend Complaint dated June 26, 2006, at 2-3. The GHP, like the *Cayuga* plaintiff, seeks remedies for violation of its alleged possessory rights in the land allegedly conveyed in violation of the Nonintercourse Act in the early to mid-nineteenth century. In addition to a declaration of title and an order of immediate

---

[17] Judge Hall, sitting by designation, dissented in part. Although she concurred that *Sherrill* required dismissal of the ejectment claim, she disagreed that laches barred the plaintiff's monetary remedies as well. *Id* at 280, 283-86 (Hall, *J.*, dissenting in part, concurring in judgment in part). Although a thoughtful discussion, Judge Hall's dissent is inconsistent with the logical extension of the Supreme Court's reasoning in *Sherrill*, *see id.* at 278, and in any event is not the law of this circuit.

possession, the GHP seek variously described money damages and an accounting of taxes paid by possessors of the land. *GHP v. Rell* Amended Complaint, at 43. Obviously, each of these forms of relief, if available at all, is entirely dependent on the alleged violation of its possessory interest. As the Second Circuit explained, it is the disruptiveness of the claim, not just the remedy, that is relevant for purposes of equitable defenses. *Cayuga,* 413 F.3d at 275.

The GHP's claims will be equally as disruptive to long-settled expectations of land ownership as those in *Sherrill* and *Cayuga*. Indeed, even a cursory glance at the properties sought reveals how inequitable, disruptive, and simply impossible granting the relief sought would be. The land the GHP seeks from the State, for example, includes parts of Routes 8 and 25 as well as the Housatonic Community College (former site of the "Hi-Ho Mall"). *GHP v. Rell* Amended Complaint, ¶¶ 41-42; *GHP v. Nyzio* Amended Complaint, ¶ 26. Accordingly, equitable doctrines of laches, acquiescence and impossibility bar the GHPs' claims, and this action should be dismissed.

As discussed above, the Second Circuit articulated six factors distilled from *Sherrill*:

1) the passage of generations during which non-Indians have owned and developed the claimed lands;
2) the longstanding, distinctly non-Indian character of the area and its inhabitants;
3) developments in the area spanning several generations;
4) residence elsewhere by most of the group since at least the mid-nineteenth century;
5) the long time span between the conveyances and the present day; and
6) the plaintiff's long delay in pursuing its claim.

*Cayuga*, 413 F.3d at 277. Each of these factors can be established conclusively either on the basis of the pleadings or by judicial notice. *See Seneca-Cayuga Tribe of Oklahoma v. Town of Aurelius*, 233 F.R.D. 278, 281-82 (N.D.N.Y. 2006); *Cayuga Indian Nation of New York v. Village of Union Springs*, 390 F. Supp. 2d 203, 206 (N.D.N.Y. 2005).

The conveyances are alleged to have taken place in 1802, 1825, 1831, 1854, and 1862. *GHP v. Rell* Amended Complaint, ¶¶ 22-25; *GHP v. Nyzio* Complaint, ¶¶ 17-18; *GHP v. Bachyrycz*, ¶¶ 16-17. Thus, several generations of non-Indians have since passed. The lands sought include much of what is now downtown Bridgeport as well as extensively developed residential neighborhoods and other properties in the Towns of Orange and Trumbull. The court may take judicial notice of the general nature and present-day character of these areas. Fed. R. Evid. 201; *see Central Green Co. v. United States*, 531 U.S. 425, 434 (2001); *Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir.), *cert. denied*, 522 U.S. 997 (1997); *Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 237 (2d Cir. 1979). As developed over the last two centuries, with numerous substantial roads, highways, homes, and other public and private buildings, the lands claimed obviously are far different in character and value than they were when conveyed. State sovereign control over the land has existed since the conveyances, and there is no evidence that the federal government's view of the State's sovereignty has been anything other than complete acceptance. *See Sherrill*, 544 U.S. at 214. The first, second, and third factors outlined above are thus easily satisfied.

The Golden Hill Indians have not resided on the land in question since they were conveyed. *GHP FD*, at 88-91 (Ex. A). Indeed, the GHP allege that it has not had possession of these lands since the alleged unlawful conveyances. *GHP v. Rell* Amended Complaint, ¶¶ 161-62. The fourth factor is satisfied.

Between 130 and 190 years have passed since the conveyances took place and the GHP initiated this action. This long time span is equally or nearly as long as those in *Sherrill* and *Cayuga*, and the GHP's claims are in all material respects just as disruptive in light of the

settled expectations of land owners because of the passage of that length of time. For the same reasons as in *Sherrill* and *Caygua*, therefore, the fifth and sixth factors are present.

There simply is no material difference between the nature and disruptiveness of the GHP's claims and the land claims in *Sherrill* and *Cayuga*. Although the land claims in *Cayuga* involved a "large swath of central New York state" – some 60,000 acres and thousands of landowners, *Cayuga*, 413 F.3d at 275 – whereas the GHP's claims cover portions of Bridgeport, Trumbull, and Orange, it is not the mere acreage that is key to the equitable defenses recognized by the Supreme Court and the Second Circuit. Instead, it is the disruption that the claims represent to longstanding ownership and developments. *Id.* If permitted to proceed, these generations-old claims will destroy the long-settled expectations of owners, including in particular a large number of residential homeowners, based on their legitimate reliance of the passage of time and the State's exercise of sovereignty over the land, not to mention the obvious impracticality of turning over to the GHP lands on which are situated state highways and a community college.[18] *Sherrill*, 544 U.S. at 216-18; *Cayuga*, 413 F.3d at 274.

Because of the long passage of time, the delay in seeking relief, and the developments in the City of Bridgeport and the Towns of Trumbull and Orange over multiple generations, the GHP's land claims are barred by the equitable doctrines of laches, acquiescence, and

---

[18] In *New York v. Shinnecock Indian Nation*, 400 F. Supp. 2d 486 (E.D.N.Y. 2005), the district court denied summary judgment on the defense of laches, concluding that there may be questions of the extent of the disruptiveness of the claims in that case. *Id.* at 496. The court suggested that certain facts could only be resolved by trial, including "the nature of the Indians' present titles and possibly the length of the delay. . . ." *Id.* The material facts here, as discussed above, are not and cannot be disputed. Thus, there is no need to await trial for the resolution of the equitable defenses raised in this motion.

impossibility.  *Sherrill*, 544 U.S. at 221; *Cayuga*, 413 F.3d at 277.  The GHP's action should be dismissed as a matter of law.

**VI.**     **CONCLUSION**

For the foregoing reasons, the defendant's motion for judgment on the pleadings should be granted, and the plaintiff's amended complaint should be dismissed.

DEFENDANT,
M. JODI RELL,
GOVERNOR OF THE STATE OF
CONNECTICUT

RICHARD BLUMENTHAL
ATTORNEY GENERAL


/s/ Mark F. Kohler
Mark F. Kohler (#ct 02272)
Assistant Attorney General
Susan Quinn Cobb (#ct 03850)
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860)808-5270
(860)808-5385(fax)
mark.kohler@po.state.ct.us
susan.cobb@po.state.ct.us

## CERTIFICATION

This certifies that a copy of the foregoing Memorandum in Support of Motion for Judgment on the Pleadings was electronically filed on this 2nd day of August, 2006, with notice of this filing served by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF System.

Bernard Wishnia
Roseland Professional Building
204 Eagle Rock Avenue
Roseland, NJ  07068

Michael D. O'Connell
O'Connell, Flaherty & Attmore
280 Trumbull Street
Hartford, CT  06103-3598

William A. Wechsler
Bailey & Wechsler
583 Slocum Road
Hebron, CT  06248

Richard L. Albrecht
Cohen & Wolf, P.C.
1115 Broad St., PO Box 1821
Bridgeport, CT  06604

Mark S. Puzella
Anthony M. Feeherry
Andrea L. Studley
Goodwin, Procter & Hoar
Exchange Place, 2nd Floor
Boston, MA  02109-2881

Henry C. Winiarski, Jr.
941 Wethersfield Avenue
Hartford, CT  06114-3137

David G. Chabot
Gerald L. Garlick
Linda Clifford Hadley
Krasow, Garlick & Hadley
One State Street
Hartford, CT  06103

John J. Kelly, Jr.
Cantor, Floman, Gross, Kelly,
Amendola & Sacramone
378 Boston Post Road
PO Box 966
Orange, CT  06477

Jeffrey R. Babbin
Noel E. Hanf
Wiggin & Dana
One Century Tower
265 Church St., PO Box 1832
New Haven, CT  06508-1832

Austin K. Wolf
Cohen & Wolf, P.C.
1115 Broad St., PO Box 1821
Bridgeport, CT  06604

Thomas Gugliotti
Updike, Kelly & Spellacy, P.C.
One State St., PO Box 231277
Hartford, CT  06123-1277

David Michael Tilles
Law Offices of Scott B. Clendaniel
300 Windsor St.
PO Box 2138
Hartford, CT 06145-2138

Geoffrey A. Hecht
Caplan Hecht Scanlon & Mendel
20 Trumbull St., PO Box 9505
New Haven, CT  06534

Janet L. Janczewski
The Southern Connecticut Gas Co.
885 Main Street
Bridgeport, CT  06604

Robert L. Berchem
Richard J. Buturla
Berchem, Moses & Devlin, P.C.
75 Broad Street
Milford, CT  06460

Andrew M. Eschen
U.S. Department of Justice
Ben Franklin Station, PO Box 663
Washington, DC  20044-6208

Judith A. Mauzaka
Gerald T. Weiner
Weinstein, Weiner, Ignal, Vogel, & Shapiro
350 Fairfield Ave., PO Box 9177
Bridgeport, CT  06601

Stuart A. Margolis
1332 Temple Street
New Haven, CT  06510

Howard R. Wolfe
Goldman Gruder & Woods
125 Mason Street
Greenwich, CT  06830

John Pirina, Jr.
Law Offices of Arnaldo J. Sierra
215 Washington Street
Hartford, CT  06106

John B. Hughes
U.S. Attorney's Office of the Attorney
General  157 Church Street, 23rd Floor, PO
Box 1824
New Haven, CT  06510

James A. Trowbridge
Quinnipiac College
Law School Clinic
275 Mount Carmel Ave.
Hamden, CT  06518-1946

Kimball Haines Hunt
Hunt, Leibert, Chester & Jacobson, P.C.
50 Weston Street
Hartford, CT  06120-4626

Mark T. Anastasi
City of Bridgeport
Office of the City Attorney
999 Broad Street, 2nd Floor
Bridgeport, CT  06604-4328

Thomas E. Behuniak
44 Greenwood Circle
Seymore, CT  06483

Michael Stanton Hillis
Dombroski, Knapsack & Hillis
129 Whitney Avenue
New Haven, CT  06510

Kenneth M. Rozich
Law Firm of Edward D. Jacobs
PO Box 1952
New Haven, CT  06509

Paul Ruszczyk
Highland Professional Center
408 Highland Avenue
Cheshire, CT  06410

/s/ Mark F. Kohler_____
Mark F. Kohler (#ct 02272)
Assistant Attorney General
Office of the Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
(860)808-5270
(860)808-5385(fax)
mark.kohler@po.state.ct.us