UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN HILL PAUGUSSETT TRIBE OF INDIANS, | CIVIL ACTION NO. 2:92CV00738 (JBA) |
| Plaintiff, | |
| vs. | |
| M. JODI RELL, GOVERNOR OF THE STATE OF CONNECTICUT, ET AL., | |
| Defendants. | AUGUST 24, 2006 |

MEMORANDUM IN SUPPORT
OF MOTION OF DEFENDANTS
THE UNITED ILLUMINATING COMPANY AND
THE SOUTHERN CONNECTICUT GAS COMPANY
FOR JUDGMENT ON THE PLEADINGS

Pursuant to Fed. R. Civ. P. 12(c), defendants The United Illuminating Company ("UI") and The Southern Connecticut Gas Company ("SCG") move for judgment in their favor as a matter of law on the claims asserted against them in the lead case of these consolidated actions.

In relevant part, plaintiff's claim is that an 1802 Act of the State of Connecticut, which authorized the sale of tribal land to others, was invalid under the federal Indian Trade and Intercourse Act, 25 U.S.C. § 177 (commonly known as the "Nonintercourse Act"). Amended Complaint (doc. 325) ¶¶ 10, 22-23, 26. Plaintiff therefore contends that all conveyances of that land were void, that the original tribal owner of that land never actually transferred title to others, and that title and possession should be confirmed as belonging to that tribal owner (whom plaintiff contends is it). *Id.* ¶ 26 Plaintiff's claim seeks restoration of its right to possess the property and to dispossess defendants of that same land. *Id.* ¶¶ 1, 26, 159-60 and Prayer for

Relief ¶ 1. Plaintiff also seeks money damages and an accounting of tax payments because of the alleged wrongful dispossession and its claimed right to the land. *Id.* ¶¶ 161-62 and Prayer for Relief ¶¶ 2-4.

One hundred and ninety years after the State of Connecticut authorized the sale of the land in question, plaintiff commenced this lawsuit on September 3, 1992. Although it was the State that authorized the sale in 1802, plaintiff named as defendants each of the owners of the land at the time of the lawsuit in 1992. In its operative complaint, plaintiff alleges that UI owns or is in possession of land at 184 E. Washington Avenue in Bridgeport in violation of the Nonintercourse Act. *Id.* ¶ 29. Plaintiff also alleges that SCG owns or is in possession of land at 412 Housatonic Avenue in Bridgeport in violation of the Nonintercourse Act. *Id.* ¶ 39.

Soon after plaintiff brought this action, several defendants addressed the complaint with extensive motions practice, concluding with this Court's ruling of July 21, 1993 (doc. 222). *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 839 F. Supp. 130 (D. Conn. 1993). For the claims arising under the Nonintercourse Act, the Court required plaintiff to complete the federal acknowledgment proceedings that plaintiff itself had initiated before the Bureau of Indian Affairs ("BIA"), and therefore dismissed the claims without prejudice. *Id.* at 134-35. The Second Circuit affirmed under principles of primary jurisdiction, modifying the judgment only to institute a stay instead of a dismissal without prejudice. *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59-61 (2d Cir. 1994).[1]

---

[1] This Court, in its 1993 ruling, also dismissed claims that plaintiff had added to its complaint in late 1992, claiming that even earlier land transfers in 1765 were void under the 1763 Proclamation of King George III. *See* Amended Complaint (doc. 59), filed Nov. 6, 1992. The dismissal was for lack of subject matter jurisdiction. 839 F. Supp. at 136-39. Plaintiff did not appeal from that portion of this Court's ruling and judgment, instead acquiescing in the jurisdictional ruling concerning claims arising from English law or royal proclamation. *See Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 55. Only the claims arising under the
(footnote continued . . . )

2

With the BIA having issued a final decision on March 18, 2005,[2] denying plaintiff's acknowledgment petition, plaintiff sought to restore this case to the active docket (doc. 292), which the Court granted on July 8, 2005 (doc. 295).[3]

## ARGUMENT

The State of Connecticut has also moved for judgment on the pleadings. The State's Memorandum of Law thoroughly explains the history of the BIA proceedings, the framework in which the BIA considered and adjudicated plaintiff's petition for federal acknowledgment as an American Indian tribe, the evidence considered by the BIA and the BIA's meticulous and exhaustive resolution of the factual issues necessary to the agency's adjudication of the petition, the overlap between those issues and the factual issues raised by the land claims here, and the legal framework under which the BIA's factual determinations must preclude plaintiff from relitigating the same issues in court. The State's Memorandum also thoroughly recounts the legal developments that make defendants' affirmative defenses of laches, long acquiescence and impossibility dispositive of plaintiff's claims as a matter of law.

---

Nonintercourse Act are now before the Court, even though plaintiff has repeated the dismissed claims in its operative complaint from July 2006. *See, e.g.*, Amended Complaint (doc. 325) ¶ 30 (alleging that UI owns or is in possession of land at 46 Congress Street in Bridgeport in violation of the Proclamation of 1763 and the laws of England). To the extent this Court considers paragraph 30 of the operative complaint to be part of this case (which it should not, under the law of the case), the arguments made in this motion, and in the incorporated motion for judgment made by the State, would equally apply to those ancient claims under English law.

[2] *See* doc. 293, ex. 1; *see also* Status Report of State of Connecticut, dated July 12, 2005 (undocketed).

[3] The Court's restoration (as did the Second Circuit's decision) applied to all three consolidated actions, the lead *Rell* (formerly *Weicker*) case and the member *Bachyrycz* and *Nyzio* cases. While UI and SCG are defendants only in *Rell*, their arguments also apply to the other two actions. Many defendants in all three actions are customers of UI and SCG, whose lines service the properties. Any adjudication by a court that calls into question title to these properties would be extremely disruptive to UI's and SCG's own businesses and their utility customers. It is this developed infrastructure that also supports laches here as a defense.

Accordingly, UI and SCG respectfully refer the Court to, and adopt as their own arguments, the State's motion (doc. 330) and supporting memorandum and exhibits (doc. 331) filed on August 2, 2006. The State has demonstrated both factually and legally that the BIA's final determination meets the test for collateral estoppel (i.e., issue preclusion). The State has also has demonstrated the need and basis for applying laches and similar defenses. UI and SCG write separately here to emphasize the particular need and compelling rationale for applying issue preclusion in this case and not duplicating the BIA proceedings with a trial on tribal status. It is essential for the multitude of private landowners sued in court that the BIA's resolution of the factual issues in the federal acknowledgment proceeding now bind plaintiff in this case. This Court should decide the threshold question of tribal status in this lawsuit as a matter of law based on how the BIA resolved that same issue, assuming the Court does not otherwise dismiss on the basis of laches.

First, it is plain from the exhibits attached to the State's Memorandum that litigating the question of tribal status is an expensive time- and labor-intensive undertaking. It is precisely for that reason that the federal government has created an expert administrative apparatus to undertake the task. As is also clear from the exhibits (e.g., Exhibit A, the "final determination"), the State of Connecticut was able to devote the time and resources necessary to fully participate in the BIA proceedings, supplying evidence, comments, briefs and other submissions. But this lawsuit is pending against many more defendants than just the State (as owner of a state highway and community college in Bridgeport) or the United States (as owner of a post office in Bridgeport). UI and SCG must expend resources to defend these lawsuits where they are specifically named as defendants and have property directly at stake, but they could prudently rely on the State to protect its citizens before a federal agency proceeding in which they were not parties. Also, in the *Bachyrycz* consolidated action, involving land in Orange, Connecticut, the

4

State and the United States are not even defendants,[4] as only individual landowners and two religious organizations are named in the complaint.[5] While the State and the United States are, in fact, defending these lawsuits, the legal principle at stake—preventing judicial relitigation of tribal status after the BIA has adjudicated the issue adverse to the plaintiff—is critical to landowners like these who potentially could face defense of land-claims lawsuits without the State or the United States as a co-defendant.[6] While these lawsuits are now consolidated, plaintiff certainly could have chosen a strategy of pursuing just the *Bachyrycz* action as a test case, making it particularly important for this Court to uphold a rule that private landowners may rely on the results of a BIA proceeding in which they deferred to the State to advocate on their behalf and obtain a result adverse to the petitioning entity.

Second, applying collateral estoppel here also respects the role of other branches of government in their dealings with American Indians. Relations with American Indian tribes are heavily regulated by federal law and involve continuing supervision by the BIA acting for the Executive Branch. *See, e.g., Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 475-

---

[4] The State is only a third-party defendant in *Bachyrycz*, brought in by the defendants there.

[5] *See, e.g.*, doc. 357 (8/22/06), at 1-2 (signature block of motion for judgment filed on behalf of nearly all *Bachyrycz* defendants, i.e., the group of Orange, CT defendants who are without owners' title insurance policies).

[6] Even when the government is a defendant to the land claim, private landowners (small and large) will incur expenses and (for individuals) emotional distress if this matter were to go to trial—with their land titles continuing to be clouded during the years it takes for discovery and trial beyond the years in which the parties have already awaited the outcome of the lengthy BIA proceedings. The large number of private landowners in these cases, who are far removed from the 19th century land transfers, also supports the defenses of laches, long acquiescence and impossibility.

76 (8th Cir. 1988).[7] When the federal government has established and fine-tuned a process for governing its relationships with tribes and the land possessed by those tribes, the courts should be loathe to disregard the outcome of that process absent a compelling, legal reason.[8] UI and SCG are aware of no legitimate reason why a federal executive agency's adjudicated judgment that the plaintiff in this case is not an American Indian tribe should be rejected and why a court should consider entry of a judgment based on conflicting findings—i.e., findings that potentially (absent other meritorious defenses) could result in land being governed by an American Indian group that the Executive Branch has expressly declined to recognize as legitimate holders of Indian title.[9]

In *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052 (10th Cir. 1993), the Tenth Circuit emphasized the judiciary's historic deference to other branches of government for determination of tribal recognition and concluded that, with the promulgation of the BIA's tribal acknowledgment regulations in 1978, it was no longer appropriate for courts to engage in *ad hoc* determinations of tribal recognition. *Id.* at 1056-58; *accord James v. United States Dep't of Health & Human Servs.*, 824 F.2d 1132, 1137-38 (D.C. Cir. 1987). The Tenth Circuit, in

---

[7] Congress has constitutional power to "regulate Commerce . . . with the Indian Tribes," U.S. Const. art. I, § 8, and has chosen to delegate to the Commissioner of Indian Affairs the power to regulate with respect to American Indian matters. 25 U.S.C. §§ 2, 9.

[8] What legal effect this Court gives to the BIA final determination could also affect how state courts handle similar American Indian land claims and the deference they give to the determination of a federal executive agency. Indeed, an entity calling itself Golden Hill Paugussett Tribe of Indians brought several land-claims lawsuits in the Connecticut Superior Court, including for land in towns not at issue in these three consolidated federal lawsuits, although all were dismissed on grounds not relevant here. *See Golden Hill Paugussett Tribe of Indians v. Town of Trumbull*, 49 Conn. App. 711, *cert. denied*, 247 Conn. 918 (1998); *Golden Hill Paugussett Tribe of Indians v. Town of Southbury*, 231 Conn. 563 (1995).

[9] For a discussion of "Indian title," see *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667-74 (1974).

considering whether an American Indian group was a "tribe" for purposes of 25 U.S.C. § 81,[10] therefore directed the plaintiff to utilize the BIA's acknowledgment procedures. 1 F.3d at 1057-58. While this Court need not decide whether a plaintiff asserting a Nonintercourse Act claim must first utilize the BIA's acknowledgment procedures where the plaintiff has not chosen that route, where the plaintiff *has* completed that process and received an agency adjudication of tribal status, it makes no policy sense to toss aside that result and favor an *ad hoc* resolution of tribal status in a lawsuit between the plaintiff and whichever landowners it chose to sue.

Third, a ruling giving preclusive effect to the BIA decision is necessary to fulfill the reason why the Second Circuit stayed this lawsuit to await the BIA's expert determination of tribal status. When courts have embraced the primary jurisdiction doctrine, they have contemplated that the agency decision may definitively determine factual issues, dispensing with the court's need to determine the same facts and hastening the conclusion of the lawsuit. The courts do not speak of duplication of functions, but rather in terms of

> a division of functions between court and agency under which the latter makes a preliminary, comprehensive investigation of all the facts [and] analyzes them . . . . It is recognized that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern.

*Federal Maritime Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 498 (1958), *cited in Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 60. The Second Circuit emphasized the need for "coordinated action" between agency and court when it held that this lawsuit should await the BIA's determination. *Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 59. But requiring this

---

[10] 25 U.S.C. § 81 is similar to the Nonintercourse Act in that it requires federal approval for certain transactions between American Indian tribes and non-Indians relative to the tribe's lands. As is the case with the Nonintercourse Act, 25 U.S.C. § 81 does not contain a definition of "tribe of Indians."

Court to oversee potentially years of discovery and months of trial is not "coordinated action" but duplicative action, making the wait for the BIA's decision for naught.

Just two years before it ruled here, the Second Circuit sounded the same theme for coordination and simplification in *Johnson v. Nyack Hospital*, 964 F.2d 116, 122-23 (2d Cir. 1992), where it held, under principles of primary jurisdiction, that a physician's claim for damages from the hospital's termination of his admitting privileges must await resolution of his complaint before a state agency that he was not legitimately terminated. Although the agency could not decide the damages claims, "the physician must first take his grievance to the [agency] . . . [b]ecause [it] has the peculiar expertise to assess whether a hospital had a sound medical reason for terminating a physician's privileges." *Id.* at 121. That is because "a legitimate medical reason for the termination is a complete defense to the physician's claim" and "[w]hether defendants had a proper medical reason for terminating Johnson's surgical privileges will be dispositive of Johnson's antitrust claims." *Id.*

To be sure, when the Second Circuit stayed this matter, it did not expressly state that the BIA's final determination would bind the litigants in this court action. That is because no court can know in advance precisely what will transpire during an administrative proceeding and how the variety of possible outcomes will fit within the criteria for issue preclusion. Under the collateral estoppel principle of privity, for example,[11] a final determination by the BIA that *favored* plaintiff would not necessarily bind entities like UI and SCG that did not participate in

---

[11] Although rules of privity can make application of non-mutual collateral estoppel asymmetric, binding a party to the first proceeding that lost on an issue, but not binding an absent person to the other party's victory on an issue in the earlier case, "the achievement of substantial justice rather than symmetry is the measure of the fairness of the rules of [preclusion]." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 325 (1971). This Court therefore need not resolve the question of symmetry in this case and whether a BIA acknowledgment of a tribe binds landowners sued in court under the Nonintercourse Act.

the BIA proceedings, but the final determination might still in some circumstances be admissible, probative evidence to aid the trier of fact in court[12] or, if it were not admissible, might still materially aid the parties and the trial court in preparing for trial and conducting an orderly, efficient trial on complex matters.

In *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 417 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094 (1977) ("*MP&L*"), the Fifth Circuit deferred adjudicating a contract claim pending resolution of an agency proceeding investigating facts relating to the alleged breach. While recognizing that the ultimate question of breach of contract was a judicial issue, *id.* at 416, the court stated that "[t]here also can be no doubt that the [agency's] informed opinion will be of material aid to the district court in the resolution of the damage action." *Id.* at 420. The court went on to hold that because "referral of this damage action would give the [agency] an opportunity to articulate its rationale and support it with relevant findings of fact . . . there are several aspects of the damage action that the [agency] decisions may *either resolve for* or, at a minimum, be of material assistance to the trial court." *Id.* (emphasis added). The court understood that an agency determination might well bind the court's consideration of the same

---

[12] See Fed. R. Evid. 803(8)(C) (as exception to hearsay rule, generally permitting admission into evidence in civil cases "factual findings resulting from an investigation made pursuant to authority granted by law"). The BIA's determination *adverse* to a party, like plaintiff, that participated fully in the agency proceeding certainly is admissible *against* plaintiff if this case were to go before a jury, but the Court need not decide that question because the legally sound and judicially efficient outcome is to have no trial at all and give the BIA's findings preclusive effect. If this Court (erroneously) fails to defer to the BIA's factual findings as a matter of law, it would still be true that defendants could obtain summary judgment simply on the strength of the admissible BIA final determination, which documented numerous instances where plaintiff, after considerable effort, could produce *no* evidence on key criteria for tribal status or only evidence that was based on speculation. *See* State's Memorandum at 13-16. It would make no sense on this record to have a protracted trial even absent principles of preclusion. The function of summary judgment is to avoid wasteful trials with preordained outcomes, and UI and SCG preserve their right to seek summary judgment on that basis even if this motion for judgment on the pleadings were to be denied.

9

issues, but did not have to know that for certain in advance[13] to defer the case under principles of primary jurisdiction since, "at a minimum," obtaining the agency's decision would assist the litigants and court.

But plaintiff's BIA petition is no longer in the posture it was when the Second Circuit ruled in this case in 1994. Using the language of *MP&L*, it was clear in 1994 that, "at a minimum," a BIA determination would "be of material assistance" to the judicial process, but it was also contemplated that a BIA determination could well do more and "resolve" the issues raised by plaintiff's judicial claims. *MP&L*, 532 F.2d at 420; *see Johnson*, 964 F.2d at 121 (Second Circuit noting that agency resolution of pertinent issue could be "dispositive" of damages claim cognizable only in court).[14] Now, in 2006, this Court can review the BIA determination and decide that the agency's factual findings do "resolve" or are "dispositive" of the judicial claims: "Once the [agency] decides the issues referred to it by the district court," the court can "determine the proper procedures for reviewing such findings and their effect on the subsequent litigation." *MP&L*, 532 F.2d at 422. The Court has before it the comprehensive, detailed findings of the BIA made after plaintiff had multiple opportunities to present, refine and obtain technical assistance to augment evidence of tribal status. Deference in this case to the BIA had its intended result, with the expert agency sifting through, organizing and adjudicating

---

[13] The court noted "that it is singularly inappropriate to determine at this point in this complex litigation what the effect of the Commission's decisions will be before the nature and extent of the Commission's action is ascertainable." 532 F.2d at 422. Accordingly, the court "express[ed] no opinion as to the degree to which the trial court in reaching its decision will be bound by prior agency determination." *Id.*

[14] Here, the Second Circuit relied on primary jurisdiction caselaw where courts had anticipated that "the [agency's] ascertained facts later serve as a premise for legal consequences to be judicially defined" or that "agency action may render a complex fact pattern simple or *a lengthy judicial proceeding short*." *Golden Hill Paugussett Tribe of Indians*, 39 F.3d at 60 (quotation marks omitted) (emphasis added).

complex facts, and there is no reason to avoid giving the agency's adjudication of those facts its maximum legal effect. *See* State's Memorandum at 17-26 (discussing law of collateral estoppel and applying it to BIA's proceedings and final determination).

Finally, it can be expected that plaintiff will argue that it has a right to a jury determination of issues, which cannot be defeated by the law of preclusion, and that it has a right to litigate those issues against the many landowners who were not participants in the BIA proceedings. But federal judicial policy on issue preclusion demands just the opposite conclusion. Simply because plaintiff has more parties to pursue in court than it had adversaries before the agency does not lessen the preclusive effect of the earlier proceeding: "Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) (quotation marks omitted). And the lack of a jury in the BIA proceedings is of no moment. As the Supreme Court explained in applying preclusion to the findings of a case tried to the court, a rule of preclusion does not withdraw issues of fact from the jury; it is just that "there is no further fact-finding function for the jury to perform, since the common factual issues have been resolved in the previous action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979).[15]

---

[15] "The determination of an issue by a judge in a proceeding conducted without a jury is conclusive in a subsequent action whether or not there would have been a right to a jury in that subsequent action if collateral estoppel did not apply." Restatement (Second) of Judgments § 27 cmt. d (1982). As the State discusses in its memorandum (at 22-26), the Restatement and binding precedent also fully support giving collateral estoppel effect to issues determined in an earlier agency adjudication where the precluded party had an adequate opportunity to litigate the issue. That is precisely what occurred here.

"[C]ollateral estoppel relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). These principles apply as much to the BIA's determination that plaintiff is not an American Indian tribe than it would to an earlier judicial determination of that issue. There is every reason to preclude more litigation, and no reason to allow plaintiff to relitigate the issue just because it is in a different forum. Because plaintiff is not an American Indian tribe, it cannot assert a claim under the Nonintercourse Act.

## CONCLUSION

The Court should grant defendants judgment on the pleadings, as a matter of law, (1) because the BIA's final determination rejecting federal acknowledgment of plaintiff as an American Indian tribe conclusively ruled against plaintiff on the issue of tribal status, which is a threshold issue under plaintiff's judicial Nonintercourse Act claims; or (2) because plaintiff's claims are barred by the defenses of laches, long acquiescence and impossibility.

Respectfully submitted,

DEFENDANTS
THE UNITED ILLUMINATING COMPANY and
THE SOUTHERN CONNECTICUT GAS
COMPANY

By: _____
Jeffrey R. Babbin (ct10859)
  jbabbin@wiggin.com
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 (fax)
Attorney for Defendants

## CERTIFICATION

I hereby certify that on this 24th day of August, 2006, the foregoing was electronically filed, with notice of this filing served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. The service list is as follows:

| | |
|---|---|
| Michael D. O'Connell, Esq.<br>O'Connell, Flaherty & Attmore<br>280 Trumbull Street<br>Hartford, CT 06103-3598 | Bernard Wishnia, Esq.<br>204 Eagle Rock Avenue<br>Roseland, NJ 07068 |
| William A. Wechsler, Esq.<br>Bailey & Wechsler<br>583 Old Slocum Road<br>Hebron, CT 06248 | Susan Quinn Cobb, Esq.<br>Mark F. Kohler, Esq.<br>Daniel R. Schaefer, Esq.<br>P.O. Box 120<br>Hartford, CT 06141-0120 |
| Mark T. Anastasi, Esq.<br>Office of the City Attorney<br>City of Bridgeport<br>999 Broad Street, 2nd floor<br>Bridgeport, CT 06604-4328 | Anthony M. Feeherry, Esq.<br>Mark S. Puzella, Esq.<br>Goodwin, Proctor & Hoar<br>Exchange Place<br>Boston, MA 02109-2881 |
| Henry C. Winiarski, Jr., Esq.<br>941 Wethersfield Avenue<br>Hartford, CT 06114-3137 | David Michael Tilles, Esq.<br>Law Offices of Scott B. Clendaniel<br>300 Windsor Street<br>P.O. Box 2138<br>Hartford, CT 06145-2138 |
| Richard L. Albrecht, Esq.<br>Austin K. Wolf, Esq.<br>Cohen & Wolf, P.C.<br>1115 Broad Street<br>P.O. Box 1821<br>Bridgeport, CT 06604 | Thomas A. Gugliotti, Esq.<br>Updike, Kelly & Spellacy, P.C.<br>One State Street<br>P.O. Box 231277<br>Hartford, CT 06123-1277 |
| Geoffrey A. Hecht, Esq.<br>Caplan, Hecht & Mendel, LLC<br>20 Trumbull Street<br>P.O. Box 9505<br>New Haven, CT 06534 | John Pirina, Jr., Esq.<br>Law Offices of Arnaldo J. Sierra<br>215 Washington Street<br>Hartford, CT 06106 |

| | |
|---|---|
| Janet L. Janczewski, Esq.<br>Southern Connecticut Gas Co.<br>855 Main Street<br>Bridgeport, CT 06604 | Kimball H. Hunt, Esq.<br>Hunt, Leibert, Chester & Jacobson, P.C.<br>50 Weston Street<br>Hartford, CT 06120-4626 |
| Richard J. Buturla, Esq.<br>Robert L. Berchem, Esq.<br>Berchem, Moses & Devlin, P.C.<br>75 Broad Street<br>Milford, CT 06460 | Andrew M. Eschen, Esq.<br>U.S. Department of Justice<br>Environment & Natural Resource<br>P.O. Box 663<br>Washington, DC 20044-6208 |
| John J. Kelly, Jr.<br>Cantor, Floman, et al.<br>378 Boston Post Road<br>P.O. Drawer 966<br>Orange, CT 06477 | Gerald T. Weiner, Esq.<br>Judith A. Mauzaka, Esq.<br>Weinstein, Weiner, et al.<br>350 Fairfield Avenue<br>P.O. Box 9177<br>Bridgeport, CT 06601 |
| Paul Ruszczyk, Esq.<br>408 Highland Avenue<br>Cheshire, CT 06410 | Stuart A. Margolis, Esq.<br>132 Temple Street<br>New Haven, CT 06510 |
| Michael S. Hillis, Esq.<br>Dombroski, Knapsack & Hillis<br>129 Whitney Avenue<br>New Haven, CT 06510 | Gerald L. Garlick, Esq.<br>Linda C. Hadley, Esq.<br>Krasow, Garlick & Hadley<br>One State Street<br>Hartford, CT 06103 |
| Kenneth M. Rozich, Esq.<br>Law Firm of Edward D. Jacobs<br>P.O. Box 1952<br>New Haven, CT 06509 | Howard R. Wolfe, Esq.<br>Goldman, Gruder & Woods<br>125 Mason Street<br>Greenwich, CT 06830 |
| Thomas E. Behuniak, Esq.<br>44 Greenwood Circle<br>Seymour, CT 06483 | James A. Trowbridge, Esq.<br>Quinnipiac University<br>Law School Clinic<br>275 Mount Carmel Avenue<br>Hamden, CT 06518-1946 |
| John B. Hughes, Esq.<br>U.S. Attorney's Office<br>157 Church Street, 23rd floor<br>P.O. Box 1824<br>New Haven, CT 06508-1824 | |

/s/ Jeffrey R. Babbin
Jeffrey R. Babbin

\10705\118\609326.3

15